## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **YAZMIN JUÁREZ COYOY, on her own behalf and as surviving parent of MARIEE CAMYL NEWBERRY JUÁREZ,** | |
| **Plaintiffs,** | Civil Action No. _____ |
| | **COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

### NATURE OF ACTION

1.      On May 10, 2018, Mariee Camyl Newbery Juárez ("Mariee") — a 21-month old girl — died as the result of inadequate and substandard medical care she received from Defendant United States of America ("Defendant" or "United States") for an entirely preventable and treatable illness that she contracted while detained by U.S. Immigration and Customs Enforcement ("ICE").

2.      Mariee was a healthy, happy infant when she and her mother, Yazmin Juárez Coyoy ("Plaintiff" or "Ms. Juárez"), fled violence and persecution in their native Guatemala and crossed the Rio Grande into southern Texas in early March 2018.  Ms. Juárez had hoped to find safe haven and a better life for herself and her baby in the United States.  Instead, shortly after spending nearly three weeks in ICE custody at the "South Texas Family Residential Center" in Dilley, Texas ("Dilley"), a 2,400-bed jail for immigrant families and children, Mariee was dead.

3.      Mariee's death was an avoidable tragedy.  Detained at Dilley in crowded, cramped conditions with many other sick children, Ms. Juárez and Mariee waited hours, at least twice, to be seen by clinic staff who were members of the ICE Health Services Corps.  Each time, the ICE clinic staff turned them away at the close of working hours without treatment, and

sent them back to the disease-ridden quarters in which immigrants were (and are still) housed. When ICE clinic staff actually did see Mariee, their examinations were cursory, and the treatments fell far below the required standard of care.  This was not merely an error in medical judgment; it was flagrant neglect that led to the death of a gravely sick child.

4.      Mariee's experience was no aberration.  Under ICE's watch, families and children at Dilley have been housed in crowded and unsafe quarters, and many suffer from untreated illnesses and other medical conditions.  These conditions endanger the health and lives of all those who are detained there, especially small children like Mariee.

5.      ICE's employees are responsible for the medical care of the detainees at Dilley. Here, the actions and omissions of the United States — through those employees — cost Mariee her life.  The United States must now answer for Mariee's pain, suffering, and tragic death, and for the severe mental pain, distress, loss of love and companionship, and other harm that Ms. Juárez has endured from the suffering and death of her infant daughter.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b).

7.      On November 27, 2018, Plaintiff submitted an administrative claim to ICE, the U.S. Department of Homeland Security ("DHS"), and the U.S. Department of Health and Human Services ("HHS").  The agencies gave notice of the final denial of the claim by certified mail on September 9, 2019.  28 U.S.C. § 2401(b).

8.      Venue is proper in the District of New Jersey because Plaintiff currently resides in the judicial district.  *See*  U.S.C. § 1402(b).

## PARTIES

9.      Mariee Camyl Newberry Juárez, a citizen of Guatemala and the infant daughter of Ms. Juárez, was 21 months old when she died from a respiratory illness she contracted while the United States detained her in abysmal conditions.

10.     Plaintiff Yazmin Juárez Coyoy is Mariee's surviving mother.  Ms. Juárez is a citizen of Guatemala and currently resides in Plainfield, New Jersey.

11.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act ("FTCA").  28 U.S.C. §§ 1346(b), 2671, *et seq.*  Through an Inter-governmental Service Agreement between ICE and the City of Eloy, Arizona, Defendant's employees at ICE and ICE Health Services Corps ("IHSC") were responsible for Ms. Juárez's and Mariee's well-being and healthcare during their detention at Dilley, and directly provided inadequate and substandard medical care to them.

## THE UNITED STATES CAUSED THE PREVENTABLE
## DEATH OF MS. JUÁREZ'S INFANT DAUGHTER

12.     On or around March 1, 2018, Ms. Juárez, a Guatemalan citizen, and her then-19-month-old daughter Mariee crossed the Rio Grande into southern Texas.  Ms. Juárez had fled Guatemala to seek asylum in the United States with Mariee because she feared for their lives and safety in Guatemala.

13.     Mother and daughter were apprehended shortly after they crossed the border, and they were temporarily detained at a U.S. Customs and Border Patrol ("CBP") immigration processing center.  On information and belief, Ms. Juárez and Mariee were held at CBP's detention facility in McAllen, Texas — a place known as the "ice box" and the "dog pound" because of its frigid temperatures and chain-link cages housing migrant adults and children.

14.     CBP gives individuals detained at the facility little to protect themselves from the cold conditions, forces them to sleep on the cold, hard concrete floor, keeps them in holding cells with the lights on 24 hours a day, and provides little, if any, soap to clean their hands after using the bathroom.  As a result, immigrants who were healthy before being detained often fall ill while in CBP custody.[1]

15.     At the CBP facility, Ms. Juárez and Mariee were forced to sleep in a locked cage with as many as 30 other people — none of whom, on information and belief, underwent a medical exam before their detention in such crowded quarters.  After four days in CBP custody, Ms. Juárez and Mariee were transferred to Dilley.

16.     When she arrived in the United States, Mariee was a normal, healthy, happy child. She had never suffered from any significant medical problems or chronic medical conditions. The medical personnel who processed Mariee for intake at Dilley on March 5, 2018 did not observe any current illnesses or health problems before admitting her into custody.

17.     Upon Ms. Juárez and Mariee's arrival at Dilley, officers assigned them to a small room with five other mothers, each with a child.  Several of those children were sick.

18.     One small boy around Mariee's age was visibly ill and very lethargic.  He had a constant cough and runny nose, and his mother said he had fallen ill at Dilley.  She had sought medical care for her son, taking him to the ICE-ran clinic very early in the morning, but the IHSC clinic staff sent them back to the housing area without seeing them.

---

[1] Mariana Alfaro, *Migrants Detained At The Border Are Kept In Freezing Cells Nicknamed 'Iceboxes' — Here's What We Know About Them*, BUSINESS INSIDER (Dec. 27, 2018), https://www.businessinsider.com/migrants-detained-at-border-kept-in-freezing-cells-nicknamed-iceboxes-2018-12#after-two-guatemalan-children-died-in-the-last-month-under-border-patrol-detention-homeland-security-secretary-kirstjen-nielsen-has-ordered-medical-checks-on-all-migrant-children-in-custody-though-its-unknown-how-many-are-currently-detained-7.

19.     Within a week, Mariee developed similar upper respiratory symptoms, including congestion and a productive cough.

20.     On March 11, 2018, an IHSC physician assistant examined Mariee, noting "no [history] of acute or chronic medical illnesses" and describing Mariee's general appearance as "well developed" and "well nourished."  But Mariee also had a cough, congestion, runny nose, and "red and swollen turbinates" (soft tissue on the side walls of the nasal cavity).  The physician assistant diagnosed Mariee with an acute upper respiratory infection and prescribed Tylenol for comfort.  According to the medical record, the physician assistant also prescribed honey packs for cough and directed a follow-up in "6 months."

21.     The next day, March 12, 2018, Ms. Juárez again sought medical attention for Mariee, who was then refusing food, running a fever of 104.2 degrees, and suffering from cough, congestion, diarrhea, and vomiting.  Another IHSC physician assistant diagnosed an ear infection, for which he prescribed Augmentin (an antibiotic), and acute bronchiolitis (inflammation of the bronchioles), for which he prescribed fever reducers and oral hydration.  Concerned about Mariee's respiratory symptoms, Ms. Juárez asked the physician assistant to conduct additional examinations.  But the physician assistant merely instructed Ms. Juárez to return to the clinic if Mariee's symptoms worsened, scheduled a follow-up in two days, and sent mother and daughter back to the housing area.

22.     In the subsequent days, Mariee's fever decreased somewhat, but she could not hold down the Augmentin prescribed for her ear infection.  Her breathing problems significantly worsened, and she continued to have diarrhea.  Ms. Juárez sought medical attention at the IHSC clinic for Mariee multiple times but was often left waiting for many hours, including at least two

instances where IHSC clinic staff turned her away and told her to wait for an appointment on another day.

23.     The clinic waiting area, resembling a gymnasium, was filled with dozens of mothers and children standing and waiting in line.  The facility had no separate area to isolate sick children from healthy ones, nor did the staff provide protective masks to guard against contagion.  When Ms. Juárez and Mariee did manage to see IHSC medical staff, the appointments often lasted just minutes, and the medical staff did not address her concerns about Mariee's deteriorating condition.  Ms. Juárez's experience echoes the accounts of parents who for many years have complained about extended waits and cursory examinations from IHSC medical staff.

24.     By March 15, 2018, when Mariee was next able to see a IHSC physician assistant, the little girl had lost two full pounds — nearly eight percent of her body weight — in the ten days since arriving at Dilley.  She continued to suffer from fever, congestion, cough, upset stomach, and very poor appetite.  The physician assistant noted an "upper respiratory infection" and directed Ms. Juárez to continue with Tylenol and Pedialyte, and to follow up in one week.

25.     Mariee's fever worsened.  On March 21, 2018, she presented with a 103.3-degree temperature, an elevated respiratory rate, and a rapid heart rate, as well as a cough, congestion, sneezing, and runny nose.  The IHSC physician stated that Mariee had "no trachypnea" (abnormally rapid breathing), even though the respiratory rate noted on the same form showed otherwise.  The physician diagnosed acute viral bronchiolitis, and prescribed Pedialyte, ibuprofen for fever, Zyrtec for runny nose, and Vicks VapoRub for congestion.

26.     These prescriptions were typical of the substandard, ineffectual treatments prescribed at Dilley for a panoply of symptoms, including ailments for which such medications

are contraindicated.  For example, as any pediatrician should know — and as the product's label and website clearly warn — children under two years old should not use Vicks VapoRub because it contains camphor, which can cause respiratory distress in small children, particularly if the child's airways are already inflamed.

27.     After ordering the use of a medicine contraindicated for a patient as young as Mariee, the IHSC physician directed Ms. Juárez to follow up again in one week, or to return if Mariee's respiratory symptoms worsened.

28.     Two days later, on March 23, 2018, Ms. Juárez once again brought Mariee to the clinic and reported that the child had been coughing and vomiting clear liquid.  Mariee was also suffering congestion, nasal discharge, had a borderline oxygen saturation of 96 percent, an elevated heart rate, and a temperature of 99.2 degrees.  Her examination revealed "red sclera," which indicates an adenovirus, though the IHSC registered nurse made no note of that possible cause.  Again, the nurse's failure to properly diagnose Mariee's illness followed a pattern all too common at Dilley.

29.     By this time, Mariee had been ill with a cough for nearly two weeks and had barely regained any weight.  Ms. Juárez asked the IHSC registered nurse to conduct a more detailed examination, particularly of Mariee's lungs.  After listening to Mariee's lungs, the registered nurse returned mother and daughter to the housing area, noting that "a referral would be made for [Mariee] to see a provider."  But that appointment never happened.

30.     On March 24, 2018, Ms. Juárez was notified of an appointment for Mariee to be seen at 8:00 a.m. the next morning.  The examination never occurred.  Instead, at 5:00 a.m. on March 25, 2018, Dilley staff moved Ms. Juárez and Mariee to a staging area for transfer out of family detention.  Ms. Juárez and Mariee — whose condition was rapidly deteriorating, and

included constant diarrhea, fever, frequent vomiting, and difficulty sleeping and eating — waited

there, without medical attention for seven hours.  At noon, ICE moved them to another location

at Dilley, gave them lunch, and put them in a van to San Antonio International Airport.  No

medical personnel examined Mariee to clear her for travel.

31.     Although no medical personnel saw, much less examined, Mariee on the day of

their departure, from Dilley, ICE medical records falsely state that, on March 25, 2018, a

"licensed vocational nurse" conducted a "Transfer Summary" and "medically cleared" Mariee

for release from Dilley.  No licensed vocational nurse (or anyone else) actually examined Mariee

that day.

32.     Indeed, the "Transfer Summary" filled out by the licensed vocational nurse

contradicts the ICE medical records above from two days earlier, which clearly showed that

Mariee was acutely ill and needed to see a physician.  The "Transfer Summary" makes no

reference that Mariee was coughing and wheezing, that she had lost a substantial percentage of

her body weight, or that she had suffered intermittent high fevers over a prolonged period.

Instead, without even having seen Mariee, but purporting to have done so, the IHSC licensed

vocational nurse answered questions on the clearance form that ignored her serious symptoms:

> Is there any medical / dental / or mental health reasons for restricting the
> length of time the alien can be on travel status?  *No*
>
> Are there any restriction [sic] or special equipment required for travel?  *No*
>
> Is a medical escort required?  *No*
>
> Are any transmission-based precautions required during transport?  *No*
>
> Additional comments?  *None*

33.     Those answers were flatly inconsistent with Mariee's prior medical records, and

her obvious condition.  The false information, however, permitted Mariee to fly.

34.     Even if the licensed vocational nurse actually had conducted an examination that day, she was not qualified to "medically clear[]" Mariee for release, and doing so exceeded the scope of her license.  Under Texas law, licensed vocational nurses cannot perform comprehensive patient assessments, initiate any nursing care plan, or implement or evaluate patient care.  Further, the record from Mariee's March 23 appointment — just two days earlier — showed that Mariee was acutely ill and needed to see a physician.

35.     Several hours after leaving Dilley, Ms. Juárez and Mariee boarded a late afternoon flight with a connection to New Jersey.  Mariee slept for most of both flights but vomited in the last hour.  A fellow passenger commented to Ms. Juárez that Mariee looked very unwell and needed to see a doctor.

36.     By the time Ms. Juárez and Mariee arrived in New Jersey after midnight, early in the morning of March 26, 2018, Mariee's condition was dire.  A few hours later, shortly after sunrise, Ms. Juárez took Mariee to a pediatrician.  After several hours, the pediatrician sent Ms. Juárez and Mariee home with additional medications and instructions to seek emergency medical attention if Mariee's condition deteriorated further.

37.     By then it was too late.  That same evening, Ms. Juárez rushed Mariee to the emergency room, where she was admitted with acute respiratory distress and a critically low blood oxygen level of 85 percent, requiring continuous supplemental oxygen.  Shortly after admission, the hospital moved Mariee to the Special Care Unit with a differential diagnosis of viral bronchiolitis versus pneumonia.  She tested positive for adenovirus and parainfluenza 3.  Over the next six weeks, Mariee was transferred to two different hospitals for increasingly specialized care requiring painful treatments, including a ventilator and later an advanced life support device (ECMO) used in dire situations.

38.     All the medical measures could not stem Mariee's continued deterioration, and the doctors even considered a lung transplant.  In the last few hours of her life, following the catastrophic hemorrhage, Marie experienced a chest tube insertion, replacement of the advanced life support device, massive blood transfusions, and CPR on her tiny body.

39.     Mariee died on May 10, 2018, following a catastrophic intrathoracic hemorrhage that resulted in irreversible brain and organ damage with no hope of survival.  The medical examiner identified the cause of death as bronchiectasis (a condition where the walls of the bronchi are thickened from inflammation and infection), pulmonitis (inflammation of the lungs), and pneumothorax (collapsed lung).

40.     In the final six weeks of Mariee's life, Ms. Juárez watched as her daughter suffered extreme physical and emotional pain.  Mariee was hospitalized continuously, surrounded by multiple medical personnel performing painful tests and examinations.  She was often chemically paralyzed and sedated.  She had multiple intravenous (IV) lines that needed to be replaced frequently, an arterial IV line for monitoring her blood gasses, a naso-gastric for tube feedings, intravenous nutritional supplementation, and a urinary catheter.  While ventilated, she could not speak.  While sedated and on paralytic drugs, along with all of the IV lines, she could not hug her mother or be held.

41.     On the day her daughter died, Ms. Juárez left the hospital with only an ink print of Mariee's right hand, made the day before as a Mother's Day gift.

## ICE'S INADEQUATE AND SUBSTANDARD TREATMENT
## OF MARIEE WAS NOT AN ISOLATED EVENT

42.     Well before Mariee arrived at Dilley in March 2018 there were a number of

incidents in which other detainees received inadequate and substandard medical care from IHSC.

Indeed, many Dilley detainees have reported incidents demonstrating equally negligent medical

attention and care.

43.     ICE itself has corroborated this pattern.  In December 2018, an ICE supervisor

raised concerns about IHSC's mistreatment and systematic provision of inadequate medical care

in an email memo to then-Acting Deputy Director of ICE Matthew Albence.  According to the

ICE supervisor, "IHSC is severely dysfunctional and unfortunately preventable harm and death

to detainees has occurred."  The memo detailed specific instances in which "detainees have

encountered preventable harm and death," and warned that "IHSC leadership is not focused on

preventing horrible recurrences."[2]

44.     Similarly, a March 2019 Department of Homeland Security ("DHS") Office for

Civil Rights and Civil Liberties memo contained allegations from the DHS Office of Inspector

General that IHSC "has systematically provided inadequate medical and mental health care and

oversight to immigration detainees throughout the U.S."[3]  The memo contained information

about a December 2017 incident at Dilley involving an 8-year old child:

> [O]n December 6, 2017, the child's mother first reported that her child had a
> progressively worsening earache for the past two weeks.  The child was
> subsequently treated using nursing guidelines for Allergies/Fever/Pain, diagnosed
> with Swimmer's Ear, and given ear drops.  However, on December 23, 2017, the

---

[2] Email Memorandum to Matthew Albence, Acting Deputy Dir. ICE (Dec. 3, 2018),
https://tyt.com/stories/4vZLCHuQrYE4uKagy0oyMA/688s1LbTKvQKNCv2E9bu7h.
[3] Memorandum from Cameron P. Quinn, Officer for Civil Rights and Civil Liberties, and Marc
Pachon, Attorney Advisor — Legal Counsel Division, Office of General Counsel to Ronald
Vitiello, Deputy Director and Senior Official Performing the Duties of the Director of ICE (Mar.
20, 2019), at 1, https://www.documentcloud.org/documents/6575024-ICE-Whistleblower-
Report.html.

child was noted to have seizure activity and was transferred to the hospital where he was diagnosed with Pott's Puffy Tumor with epidural and subdural abscess resulting in partial frontal bone resection.  Further the complainant alleged that MQMU [ICE's Medical Quality Management Unit] performed an analysis of the case and found that the inadequate medical care provided by [ICE at Dilley] was a contributory factor resulting in harm.  MQMU's report was forwarded to IHSC leadership and MQMU requested findings and/or interventions from Clinical Services, yet IHSC leadership failed to take appropriate action.

In other words, Mariee was neither the first nor the last child to be the victim of negligent and substandard treatment at Dilley by ICE medical staff.

### FIRST CAUSE OF ACTION
### (TEXAS SURVIVAL STATUTE: NEGLIGENCE AND GROSS NEGLIGENCE)
### (Tex. Civ. Prac. & Rem. Code § 71.021, *et seq.*)

45.     Plaintiff repeats and restates each of the above allegations.

46.     Ms. Juárez is the surviving mother of Mariee, and she is the legal representative and an heir of Mariee's estate.  Ms. Juárez brings this action for the benefit of all beneficiaries entitled to recover under the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, et seq., by reason of Mariee's death.

47.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

48.     The United States failed Mariee.  It breached its duties by (1) failing to provide Mariee with adequate medical care meeting the applicable standard of care; and (2) failing to ensure that Mariee was fit for travel.

49.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct, Mariee contracted and suffered avoidable complications of upper respiratory illness that the United States failed adequately to diagnosis or

treat with appropriate medical care until her conditions were irreversible and ultimately fatal. The United States' negligence, gross negligence, and recklessness also caused Mariee to suffer extreme and extended physical, mental, and emotional pain and distress and death.

50.     Had she lived, Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her.

<b><u>SECOND CAUSE OF ACTION</u></b><br><b>(TEXAS WRONGFUL DEATH ACT: NEGLIGENCE AND GROSS NEGLIGENCE)</b><br><b>(Tex. Civ. Prac. & Rem. Code § 71.001, <i>et seq.</i>)</b>

51.     Plaintiff repeats and restates each of the above allegations.

52.     Ms. Juárez is the surviving mother of Mariee, and she brings this action for the benefit of all beneficiaries entitled to recover under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001, et seq., by reason of Mariee's death.

53.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

54.     The United States failed Mariee.  It breached its duties by  (1) failing to provide Mariee with adequate medical care meeting the applicable standard of care; and (2) failing to ensure that Mariee was fit for travel.

55.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct that caused her daughter's death, Ms. Juárez suffered extreme mental and emotional pain and distress, as well as loss of love, companionship, support, enjoyment of life, and other benefits that would have been provided by Mariee, in an amount to be proved at the time of trial.  Ms. Juárez has also incurred reasonable and necessary expenses

for Mariee's funeral, burial, and memorial services, as well as for Mariee's medical care in the weeks leading up to her death.

56.     Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her if she had lived.

### THIRD CAUSE OF ACTION
**(TEXAS SURVIVAL STATUTE: MEDICAL NEGLIGENCE)**
**(Tex. Civ. Prac. & Rem. Code §§ 74.051, 74.052—Medical Liability Act)**

57.     Plaintiff repeats and restates each of the above allegations.

58.     Ms. Juárez is the surviving mother of Mariee, and she is the legal representative and an heir of Mariee's estate.  Ms. Juárez brings this action for the benefit of all beneficiaries entitled to recover under the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, et seq., by reason of Mariee's death.

59.     Defendant—through the IHSC—is a health care provider.

60.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

61.     The United States failed Mariee.  It breached its duties by (1) failing to provide Mariee with adequate medical care meeting the applicable standard of care; and (2) failing to ensure that Mariee was fit for travel.

62.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct, Mariee contracted and suffered avoidable complications of upper respiratory illness that the United States failed adequately to diagnosis or treat with appropriate medical care until her conditions were irreversible and ultimately fatal.

The United States' negligence, gross negligence, and recklessness also caused Mariee to suffer extreme and extended physical, mental, and emotional pain and distress and death.

63.     Had she lived, Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her.

### FOURTH CAUSE OF ACTION
**(TEXAS WRONGFUL DEATH ACT: MEDICAL NEGLIGENCE)**
**(Tex. Civ. Prac. & Rem. Code §§ 74.051, 74.052—Medical Liability Act)**

64.     Plaintiff repeats and restates each of the above allegations.

65.     Ms. Juárez is the surviving mother of Mariee, and she brings this action for the benefit of all beneficiaries entitled to recover under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001, et seq., by reason of Mariee's death.

66.     Defendant—through the IHSC—is a health care provider.

67.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

68.     The United States failed Mariee.  It breached its duties by (1) failing to provide Mariee with adequate medical care meeting the applicable standard of care; and (2) failing to ensure that Mariee was fit for travel.

69.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct that caused her daughter's death, Ms. Juárez suffered extreme mental and emotional pain and distress, as well as loss of love, companionship, support, enjoyment of life, and other benefits that would have been provided by Mariee, in an amount to be proved at the time of trial.  Ms. Juárez has also incurred reasonable and necessary expenses

for Mariee's funeral, burial, and memorial services, as well as for Mariee's medical care in the weeks leading up to her death.

70.     Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her if she had lived.

## FIFTH CAUSE OF ACTION
### (TEXAS SURVIVAL STATUTE: NEGLIGENCE PER SE)
### (Tex. Civ. Prac. & Rem. Code § 71.021, *et seq.*)

71.     Plaintiff repeats and restates each of the above allegations.

72.     Ms. Juárez is the surviving mother of Mariee, and she is the legal representative and an heir of Mariee's estate.  Ms. Juárez brings this action for the benefit of all beneficiaries entitled to recover under the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, et seq., by reason of Mariee's death.

73.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

74.     Under Texas law, licensed vocational nurses are not authorized to perform comprehensive patient assessments, to initiate any nursing care plan, or to implement or evaluate patient care.

75.     ICE medical records state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" before Ms. Juárez and Mariee were released and "medically cleared" Mariee for release from Dilley.

76.     A licensed IHSC vocational nurse was not qualified to "medically clear[]" Mariee for release, and doing so exceeded the scope of her license.

77.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct, Mariee contracted and suffered avoidable complications of upper respiratory illness that the United States failed adequately to diagnosis or treat with appropriate medical care until her conditions were irreversible and ultimately fatal. The United States' negligence, gross negligence, and recklessness also caused Mariee to suffer extreme and extended physical, mental, and emotional pain and distress and death.

78.     Had she lived, Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her.

## SIXTH CAUSE OF ACTION
### (TEXAS WRONGFUL DEATH ACT: NEGLIGENCE PER SE)
### (Tex. Civ. Prac. & Rem. Code § 71.001, *et seq.*)

79.     Plaintiff repeats and restates each of the above allegations.

80.     Ms. Juárez is the surviving mother of Mariee, and she brings this action for the benefit of all beneficiaries entitled to recover under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001, et seq., by reason of Mariee's death.

81.     The United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—to provide appropriate medical care for all detainees, including Mariee, and to ensure that the medical care administered adhered to the standards of pediatric medical care.

82.     Under Texas law, licensed vocational nurses are not authorized to perform comprehensive patient assessments, to initiate any nursing care plan, or to implement or evaluate patient care.

83.     ICE medical records state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" before Ms. Juárez and Mariee were released and "medically cleared" Mariee for release from Dilley.

84.     A licensed IHSC vocational nurse was not qualified to "medically clear[]" Mariee for release, and doing so exceeded the scope of her license.

85.     As a direct and proximate result of the United States' negligent, grossly negligent, and reckless acts, omissions, and conduct that caused her daughter's death, Ms. Juárez suffered extreme mental and emotional pain and distress, as well as loss of love, companionship, support, enjoyment of life, and other benefits that would have been provided by Mariee, in an amount to be proved at the time of trial.  Ms. Juárez has also incurred reasonable and necessary expenses for Mariee's funeral, burial, and memorial services, as well as for Mariee's medical care in the weeks leading up to her death.

86.     Mariee would have been entitled to bring an action against the United States for the injuries it inflicted on her if she had lived.

## JURY DEMAND

87.     Ms. Juárez requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Yazmin Juárez Coyoy respectfully requests that the Court enter a judgment against Defendant the United States of America for the following:

a.     Actual damages;

b.     Exemplary damages;

c.     Costs of court;

d.     Pre-judgment and post-judgment interest;

e.     All other relief, in law or equity, to which Ms. Juárez is entitled.

Dated:  March 6, 2020.

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:   */s/ Paul J. Fishman*
     Paul J. Fishman
     ARNOLD & PORTER
       KAYE SCHOLER LLP
     One Gateway Center
     Suite 1025
     Newark, NJ 07102
     paul.fishman@arnoldporter.com

     R. Stanton Jones*
     Robert N. Weiner*
     Sally L. Pei*
     Daniel F. Jacobson*
     ARNOLD & PORTER
       KAYE SCHOLER LLP
     601 Massachusetts Ave. NW
     Washington, DC 20001
     stanton.jones@arnoldporter.com
     robert.weiner@arnoldporter.com
     sally.pei@arnoldporter.com
     daniel.jacobson@arnoldporter.com

Harry K. Fidler*
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
harry.fidler@arnoldporter.com

Christopher M. Odell*
Amanda S. Thomson*
ARNOLD & PORTER
   KAYE SCHOLER LLP
Bank of America Center
700 Louisiana Street, Suite 4000
Houston, TX 77002
christopher.odell@arnoldporter.com
amanda.thomson@arnoldporter.com

*Motions for admission *pro hac vice*
forthcoming

**COUNSEL FOR PLAINTIFF
YAZMIN JUÁREZ COYOY, on her
own behalf and as surviving parent of
MARIEE CAMYL NEWBERRY
JUÁREZ**