Paul J. Fishman
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102
paul.fishman@arnoldporter.com

R. Stanton Jones
(*pro hac vice* motion pending )
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
stanton.jones@arnoldporter.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YAZMIN JUÁREZ COYOY, on her own behalf and as surviving parent of MARIEE CAMYL NEWBERRY JUÁREZ,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 20-cv-02501-KM-ESK<br><br>Honorable Kevin McNulty |

**PLAINTIFF YAZMIN JUÁREZ COYOY'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER THE CASE**
**TO THE WESTERN DISTRICT OF TEXAS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

ARGUMENT ........ 7

I. Venue Is Proper Under 28 U.S.C. § 1402(b) Because Plaintiff Resides in New Jersey ........ 7

II. Transfer Is Not Warranted Under the First-Filed Rule or 28 U.S.C. § 1404(a) ........ 11

A. The First-Filed Rule Does Not Support Transfer ........ 11

B. 28 U.S.C. § 1404(a) Does Not Support Transfer ........ 14

1. The Private Interest Factors Weigh Against Transfer ........ 14

2. The Public Interest Factors Also Weigh Against Transfer ........ 17

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akishev v. Kapustin*,
23 F. Supp. 3d 440 (D.N.J. 2014) ....................12

*Alvarado v. United States*,
No. 16-5028 (MCA), 2017 WL 2303758 (D.N.J. May 25, 2017) .................... *passim*

*Doe v. United States*,
No. 3:16-cv-0856, 2017 WL 4864850 (M.D. Tenn. Oct. 26, 2017) .................... 17, 19

*E.E.O.C. v. Univ. of Pa.*,
850 F.2d 959 (3d Cir. 1988) .................... 11, 12

*Elkins v. Moreno*,
435 U.S. 647 (1978) ....................10

*Federal Land Bank of St. Paul v. Bismarck Lumber Co.*,
314 U.S. 95 (1941) ....................9

*Flores v. United States*,
108 F. Supp. 3d 126 (E.D.N.Y. 2015) .................... 8, 10

*Flores v. United States*,
142 F. Supp. 3d 279 (E.D.N.Y. 2015) .................... 14, 16, 17, 19

*Indivior Inc. v. Dr. Reddy's Labs. S.A.*,
No. 17-7111, 2018 WL 4921541 (D.N.J. July 12, 2018), *report and recommendation adopted and aff'd by* 2018 WL 4089031 (D.N.J. Aug. 27, 2018) ....................12

*Joao Control & Monitoring Systems, LLC v. Ford Motor Co.*,
No. 12-1479, 2013 WL 4496644 (D. Del. Aug. 21, 2013) ....................18

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995) .................... 14, 15, 18

*Kedia v. Jamal*,
No. 06-6054, 2007 WL 1239202 (D.N.J. Apr. 25, 2007) ....................11

*Lok v. I.N.S.*,
681 F.2d 107 (2d Cir. 1982) ....................10

*Myers v. Am. Dental Ass'n*,
695 F.2d 716 (3d Cir. 1982) ....................7

*NCR Credit Corp. v. Ye Seekers Horizon, Inc.*,
17 F. Supp. 2d 317 (D.N.J. 1998) ....................16

*Tekno Prods., Inc. v. Glove Trends Inc.*,
No. 19-00091, 2019 WL 7184544 (D.N.J. Dec. 26, 2019) ....................11, 12

*Wm. H. McGee Co., Inc. v. United Arab Shipping Co.*,
6 F. Supp. 2d 283 (D.N.J. 1997) ....................15

*Yocham v. Novartis Pharmaceuticals Corp.*,
565 F. Supp. 2d 554 (D.N.J. 2008) ....................19

**Statutes**

28 U.S.C. § 1391(c)(1) ....................8, 9, 10

28 U.S.C. § 1402(b) ....................7

28 U.S.C. § 1404(a) .................... 2, 7, 11, 14

**Rules**

Fed. R. Civ. P. 26(f) ....................14

**Legislative Materials**

H.R. Rep. 112–10 (Feb. 11, 2011) ....................10

**PRELIMINARY STATEMENT**

In the spring of 2018, while Plaintiff Yazmin Juárez Coyoy and her infant daughter Mariee were detained at an ICE detention facility in Dilley, Texas ("Dilley"), Mariee contracted a treatable respiratory illness. The ICE medical personnel at Dilley, however, provided woefully inadequate and substandard care. Two weeks later, an ICE "licensed vocational nurse"—who is not legally authorized to perform comprehensive patient assessments, to initiate any nursing care plan, or to implement or evaluate patient care—"medically cleared" Mariee for release from Dilley without even seeing the child.

Upon their release, Ms. Juárez and Mariee flew from Texas to New Jersey, where Mariee was promptly taken to a local doctor and then a local emergency room. But it was too late. Over the next six weeks, as her condition deteriorated, Mariee received increasingly specialized treatment at three hospitals in New Jersey and the surrounding area. She died on May 10, 2018.

The Government does not and cannot deny that the Complaint states viable claims against the United States for negligence, gross negligence, medical negligence, and negligence *per se* based on the substandard care Mariee received at Dilley and the egregious decision to ignore the little girl's dire condition and release her for a flight from Texas to New Jersey. Instead, after having illegally sent Mariee from Texas to New Jersey where she died tragically and painfully, the Government asks this Court to transfer this case and force her mother to return to Texas for relief. The Court should deny the Government's motion.

First, the Government's argument that venue is improper in this District conflicts with this Court's precedent and the plain text of the relevant venue statutes. As the Government acknowledges in a footnote (Mot. 10 n.3), this Court has held that any "natural person," including an undocumented immigrant like Ms. Juárez, may bring a lawsuit under the Federal Tort Claims Act in the judicial district where the plaintiff is domiciled. *Alvarado v. United*

*States*, No. 16-5028 (MCA), 2017 WL 2303758, at *2-5 (D.N.J. May 25, 2017). Because Ms. Juárez is undisputedly a natural person domiciled in New Jersey, venue is proper here.

Alternatively, invoking the first-filed rule and 28 U.S.C. § 1404(a), the Government requests that this Court exercise its discretion and require Ms. Juárez to pursue this litigation in Texas where her separate suit is pending against the private prison company that operates the Dilley detention facility. But the first-filed rule does not apply here for a multitude of reasons, including that the parties and issues in the two cases are substantially different. And, as in *Alvarado* and similar decisions of other courts, the relevant private and public interest factors weigh heavily against a discretionary transfer under § 1404(a).

The Government's motion to transfer should be denied.

## FACTUAL BACKGROUND

On or around March 1, 2018, Ms. Juárez, a Guatemalan citizen seeking asylum in the United States, crossed the U.S.-Mexico border into Texas carrying her then-19-month-old daughter Mariee. Compl. ¶ 12. They were promptly apprehended and taken to a U.S. Customs and Border Protection ("CBP") holding facility in McAllen, Texas, known as the "ice box" and the "dog pound" because of its frigid temperatures and chain-link cages housing migrant adults and children. *Id.* ¶ 13. Several days later, Ms. Juárez and Mariee were transferred to the "South Texas Family Residential Center" in Dilley, Texas, a 2,400-bed ICE detention facility for immigrant families and children. *Id.* ¶¶ 2, 15.

When she arrived in the United States, Mariee was a normal, healthy child who had never suffered from any significant medical problems or chronic medical conditions. *Id.* ¶ 16. Indeed, the medical personnel who processed Mariee for intake at Dilley on March 5, 2018 did not observe any current illnesses or health problems before admitting her into custody. *Id.*

At Dilley, however, Ms. Juárez and Mariee were assigned to a small room with five other mothers, each with a child, several of whom were sick. *Id.* ¶¶ 17-18. Within a week, Mariee developed upper respiratory symptoms, including congestion and a productive cough. *Id.* ¶ 19.

Over the next two weeks, Ms. Juárez repeatedly sought medical care for Mariee, but the ICE Health Services Corps ("IHSC") medical staff at Dilley turned her away on multiple occasions. *Id.* ¶¶ 3, 22. On the five occasions Ms. Juárez and Mariee did manage to see the IHSC medical staff, their examinations of Mariee were cursory, often lasting just minutes, and did not address Ms. Juárez's concerns about Mariee's deteriorating condition. *Id.* ¶¶ 3, 22.

On March 11, 2018, at the first of those examinations, Mariee presented with a cough, congestion, runny nose, and "red and swollen turbinates" (soft tissue on the side walls of the nasal cavity). *Id.* ¶ 20. An IHSC physician assistant diagnosed her with an acute upper respiratory infection, prescribed Tylenol for comfort and honey packs for cough, and directed a follow-up visit in "*6 months*." *Id.* (emphasis added).

Ms. Juárez did not wait six months. Instead, by the next day, March 12, 2018, Mariee was refusing food and presented with a fever of 104.2 degrees, cough, congestion, diarrhea, and vomiting. *Id.* ¶ 21. A different IHSC physician assistant diagnosed an ear infection, for which he prescribed an antibiotic, and acute bronchiolitis (inflammation of the bronchioles), for which he prescribed fever reducers and oral hydration. *Id.* He scheduled a follow-up in two days. *Id.*

On March 15, 2018, after having been turned away at least twice despite waiting many hours, Ms. Juárez and Mariee managed to get another visit with the IHSC medical staff. *Id.* ¶¶ 23-24. By then, the little girl had lost two full pounds—nearly eight percent of her body weight—in the ten days since arriving at Dilley. *Id.* ¶ 24. She was suffering from fever, congestion, cough, upset stomach, and very poor appetite. *Id.* A different IHSC physician

assistant noted an "upper respiratory infection" and directed Ms. Juárez to continue with Tylenol and Pedialyte and to follow up in one week. *Id.*

On March 21, 2018, Mariee presented with a fever of 103.3 degrees, an elevated respiratory rate, a rapid heart rate, cough, congestion, sneezing, and runny nose. *Id.* ¶ 25. An IHSC physician documented in the record of the examination that Mariee had "no trachypnea" (abnormally rapid breathing), even though the respiratory rate noted on the same record showed otherwise. *Id.* The IHSC physician diagnosed acute viral bronchiolitis and prescribed Pedialyte, ibuprofen for fever, and Zyrtec for runny nose. This physician also prescribed Vicks VapoRub for congestion, *id.*, even though the product's label and website warn that children under two years old, like Mariee at the time, should not use Vicks VapoRub because it contains camphor, which can cause respiratory distress in small children, particularly if the child's airways are already inflamed, *id.* ¶ 26.

The fifth and last examination at the IHSC clinic took place on March 23, 2018, when Ms. Juárez reported that Mariee had been coughing and vomiting clear liquid, and she was suffering congestion, nasal discharge, a borderline oxygen saturation of 96 percent, an elevated heart rate, and a temperature of 99.2 degrees. *Id.* ¶ 28. Her examination revealed "red sclera," which indicates an adenovirus, though the IHSC registered nurse made no note of that possible cause. *Id.* By this time, Mariee had been ill with a cough for nearly two weeks and had barely regained any weight. *Id.* ¶ 29. Ms. Juárez asked the IHSC registered nurse to conduct a more detailed examination, particularly of Mariee's lungs. *Id.* After listening to Mariee's lungs, the registered nurse noted that "a referral would be made for [Mariee] to see a provider." *Id.*

That appointment never happened. *Id.* Instead, at 5:00 a.m. on March 25, 2018, Ms. Juárez and Mariee—whose condition was rapidly deteriorating and included constant diarrhea,

fever, frequent vomiting, and difficulty sleeping and eating—were taken to a staging area for transfer out of ICE detention. *Id.* ¶ 30. They waited there, without medical attention, for hours. *Id.* Around midday, still not having seen any medical personnel, they were taken to another location at Dilley, given lunch, and put in a van to San Antonio International Airport. *Id.*

ICE medical records state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" and "medically cleared" Mariee for release from Dilley. *Id.* ¶ 31. Those records are false: no licensed vocational nurse (or anyone else) actually examined Mariee that day. *Id.* Nor does the "Transfer Summary" mention that Mariee was coughing and wheezing, that she had lost a substantial percentage of her body weight, or that she had suffered intermittent high fevers over a prolonged period. *Id.* ¶ 32. Instead, without even having seen Mariee, but purporting to have done so, the IHSC licensed vocational nurse wrote that there were no "medical . . . reasons for restricting" Mariee's travel, that there was no "restriction or special equipment required for travel," that there were no "transmission-based precautions required during transport," and that the licensed vocational nurse had no "[a]dditional comments." *Id.*

Even if the IHSC licensed vocational nurse had examined Mariee, she was not qualified to "medically clear[]" the child for release. *Id.* ¶ 34. Indeed, doing so exceeded the scope of her license. *Id.* Under Texas law, licensed vocational nurses cannot perform comprehensive patient assessments, initiate any nursing care plan, or implement or evaluate patient care. *Id.*

The false information on the form, which was completely inconsistent with Mariee's prior medical records and her obvious condition, authorized Mariee to fly. *Id.* ¶ 33. And the trip was long. Several hours after leaving Dilley, Ms. Juárez and Mariee boarded a flight from Texas that required a connection to New Jersey. *Id.* ¶ 35. After arriving in New Jersey in the early hours of March 26, 2018, Ms. Juárez took Mariee to a pediatrician the same day. *Id.* ¶ 36. That

evening, Ms. Juárez took Mariee to an emergency room, where she was admitted with acute respiratory distress and a critically low blood oxygen level of 85 percent, requiring continuous supplemental oxygen. *Id.* ¶ 37. Shortly after her admission, the hospital moved Mariee to the Special Care Unit, and she tested positive for adenovirus and parainfluenza 3. *Id.* Over the next six weeks, Mariee was transferred to two different hospitals for increasingly specialized care requiring painful treatments, including a ventilator and later an advanced life support device (ECMO) used in dire situations. *Id.*

Throughout that period, Mariee was hospitalized continuously, surrounded by medical personnel performing painful tests and examinations. *Id.* ¶ 40. She was often chemically paralyzed and sedated. *Id.* She had multiple intravenous (IV) lines that needed to be replaced frequently, an arterial IV line for monitoring her blood gasses, a naso-gastric for tube feedings, intravenous nutritional supplementation, and a urinary catheter. *Id.* While ventilated, she could not speak. *Id.* While sedated and on paralytic drugs, along with all of the IV lines, she could not hug her mother or be held. *Id.*

In the last few hours of her life, following a catastrophic hemorrhage, Marie experienced a chest tube insertion, replacement of the advanced life support device, massive blood transfusions, and CPR. *Id.* ¶ 38. Mariee died on May 10, 2018. *Id.* ¶ 39.

Ms. Juárez filed this action under the Federal Tort Claims Act on March 6, 2020. The Complaint asserts claims under Texas law for negligence, gross negligence, and medical negligence based on the Government's failure to provide Mariee with adequate medical care meeting the applicable standard of care and the failure to ensure that Mariee was fit for travel. *Id.* ¶¶ 45-70. The Complaint also asserts Texas law claims for negligence *per se* because the licensed vocational nurse who purportedly "medically cleared" Mariee for release was not

qualified to do so and doing so exceeded the scope of her license. *Id.* ¶¶ 71-86. Ms. Juárez brings these claims against the United States under the FTCA because the United States was directly responsible—through the IHSC employees who staffed the clinic at Dilley—for providing appropriate medical care for all detainees, including Mariee, and for ensuring that the medical care Mariee did receive was consistent with standards of pediatric medical care. *Id.* ¶¶ 11, 47, 53, 60, 67, 73, 81.

## ARGUMENT

The Government's motion to transfer should be denied. First, venue is proper in this District under 28 U.S.C. § 1402(b) because Ms. Juárez resides in New Jersey. Second, a discretionary transfer is inappropriate under either the first-filed rule or 28 U.S.C. § 1404(a).

### I. Venue Is Proper Under 28 U.S.C. § 1402(b) Because Plaintiff Resides in New Jersey

The Government contends that venue is improper in this District because, as an undocumented immigrant, "Plaintiff is not a resident of New Jersey for purposes of venue." Mot. 7. But as the Government acknowledges in a footnote, this Court "reached the opposite result" in a case strikingly similar to this one. *Id.* at 10 n.3 (citing *Alvarado v. United States*, No. 16-5028 (MCA), 2017 WL 2303758, at *3 (D.N.J. May 25, 2017)). In *Alvarado*, this Court correctly construed the relevant venue statutes and rejected the same flawed arguments the Government makes in this case. The Court should do the same again here.

In a Rule 12(b)(3) motion, the movant—here, the Government—bears the burden of proving that venue is improper. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724-25 (3d Cir. 1982). Under 28 U.S.C. § 1402(b), venue for an FTCA action lies "only in the judicial district *where the plaintiff resides* or wherein the act or omission complained of occurred" (emphasis added). And under 28 U.S.C. § 1391(c)(1), "[f]or all venue purposes," "*a natural person*,

including an alien lawfully admitted for permanent residence in the United States, *shall be deemed to reside* in the judicial district in which that person is *domiciled*" (emphases added).

In *Alvarado*, this Court held that "[t]he plain text of 1391(c)(1) authorizes *all* non-citizens—regardless of LPR [*i.e.*, lawful permanent resident] status—to establish residency where they are domiciled." 2017 WL 2303758, at *2 (emphasis in original). As the Court explained, "[t]he ordinary meaning of 'natural person' is an individual." *Id.* The Court further stated that § 1391(c)(1) "does not limit the term 'natural persons' in any way, and thus includes all natural persons." *Id.* "When Congress intends to exclude it says so." *Id.* Accordingly, the Court in *Alvarado* denied the United States' motion to transfer the undocumented-immigrant plaintiff's FTCA lawsuit to the Western District of Texas, where ICE and CBP officers had allegedly mistreated her and her child while they were in immigration detention. *Id.*; *see also Flores v. United States*, 108 F. Supp. 3d 126, 130 (E.D.N.Y. 2015) (likewise refusing to transfer undocumented immigrant's FTCA lawsuit to Texas, as "[a]lienage is not a reason stated in [§ 1391(c)(1)] as a basis for finding persons outside its reach" (cleaned up)).

Applying the statute's plain text here, Ms. Juárez resides in New Jersey for purposes of venue. Ms. Juárez is obviously a "natural person," and the Government expressly acknowledges that Ms. Juárez "*is currently domiciled in New Jersey*." Mot. 8 (emphasis added); *see* Compl. ¶¶ 8, 10 (alleging that Ms. Juárez resides in Plainfield, New Jersey). As a natural person domiciled in New Jersey, Ms. Juárez is deemed to reside here under § 1391(c)(1), and thus venue is proper in this District under § 1402(b).

Disregarding this straightforward analysis, the Government argues that the clause "including an alien lawfully admitted for permanent residence in the United States" limits the scope of § 1391(c)(1) to non-citizens with "LPR status." Mot. 9. The Government contends that

this clause "would be superfluous" if the term "natural person" in § 1391(c)(1) included non-citizens without LPR status. *Id.* In other words, the Government urges that Ms. Juárez "is not a resident of [New Jersey] for venue purposes because she has not established that she is 'an alien lawfully admitted for permanent residence in the United States.'" *Id.* at 8.

These are the exact same arguments that this Court rejected in *Alvarado*. As the Court explained there, "a more plausible reading—the one that is plain on its face—is that LPRs are merely an illustrative example of 'natural persons.'" 2017 WL 2303758, at *3. As a matter of both basic English grammar and Supreme Court precedent, "the term 'including is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.'" *Id.* (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). "Here, the general principle is that 'natural persons' can establish residency where they are domiciled, and individuals with LPR status are merely an illustrative example of natural persons." *Id.* The Government cites no support for its view that the statute's "including" clause somehow limits the term "natural persons" to non-citizens with LPR status.

The Government contends that the legislative history of the Federal Courts Jurisdiction and Venue Clarification Act of 2011, which added the definition of "resides" in § 1391(c)(1), "confirms that aliens lacking LPR status are not residents for the purpose of establishing venue." Mot. 10. Once again, this Court rejected the exact same argument in *Alvarado*, holding that "the legislative history confirms that Congress intended that domicile, *regardless of LPR status*, governs an individual's ability to establish residence, and therefore venue." 2017 WL 2303758, at *3 (emphasis added). A House Judiciary Committee Report states that § 1391(c)(1) "would provide that, for venue purposes, *a natural person* would be deemed to reside in the judicial district in which that person is domiciled, thereby resolving the division of authority regarding

the residence of parties by adopting the majority rule." H.R. Rep. 112–10, at 21 (Feb. 11, 2011) (emphasis added). This explanation "does not distinguish between the application of the statute to LPRs and to non-citizens without LPR status." *Alvarado*, 2017 WL 2303758, at *3. While a footnote in the committee report may suggest otherwise, a footnoted suggestion in a committee report cannot overcome the plain and unambiguous statutory text establishing that any "natural person," without exception, resides where he or she is domiciled.

To the extent the Government is arguing that undocumented immigrants can never be domiciled anywhere in the United States, that argument is belied by the Government's own admission *in this case* that Ms. Juárez "is currently domiciled in New Jersey." Mot. 8. It is also inconsistent with *Alvarado* and other cases holding, in the specific context of venue for FTCA lawsuits like this one, that undocumented-immigrant plaintiffs had established domicile in the states where they were living. *Alvarado*, 2017 WL 2303758, at *4; *Flores*, 108 F. Supp. 3d at 131 (holding that "[p]ermanent resident status is not required" to establish domicile). As this Court explained in *Alvarado*, "[c]ourts have recognized that non-LPR aliens can establish domicile so long as they show a lawful intent to remain in the United States." 2017 WL 2303758, at *4. "[A]n alien d[oes] not have to be a permanent resident to harbor a lawful intent to remain," and thus "aliens [can] become lawful domiciliaries without becoming permanent residents." *Lok v. I.N.S.*, 681 F.2d 107, 109 (2d Cir. 1982) (citing *Elkins v. Moreno*, 435 U.S. 647, 666 (1978)). "In other words, non-LPRs may also establish domicile" in the states where they live. *Alvarado*, 2017 WL 2303758, at *4. Ms. Juárez has done so here, establishing that she is domiciled—and thus resides—in Plainfield, New Jersey. *See* Compl. ¶¶ 2, 8, 10, 12.

Because Ms. Juárez resides in New Jersey, venue is proper in this District under § 1402(b). The Government's Rule 12(b)(3) motion to transfer thus should be denied.

## II. Transfer Is Not Warranted Under the First-Filed Rule or 28 U.S.C. § 1404(a)

Unable to show to venue is improper, the Government alternatively argues that the Court should exercise its discretion to transfer this case to the Western District of Texas under the first-filed rule or 28 U.S.C. § 1404(a). But the first-filed rule does not apply for multiple reasons, and the private and public interest factors weigh heavily against transfer pursuant to § 1404(a).

### A. The First-Filed Rule Does Not Support Transfer

In support of its motion, the Government notes that Ms. Juárez has filed a lawsuit based on Mariee's death against the private prison company that operates the Dilley detention facility. Because she filed that lawsuit in the Western District of Texas before she filed this action, the Government contends that the first-filed rule militates in favor of transfer. It does not.

It is true that, under the "first-filed rule," a district court has discretion to transfer, stay, or potentially dismiss a later-filed case "involving the same parties and the same issues already before another district court." *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 959, 971 (3d Cir. 1988). "Although some circuits have interpreted the first-filed rule liberally, applying it when two actions involve a 'similarity of core issues' or a 'closely related question,' the Third Circuit has interpreted the first-filed rule narrowly, holding that it only applies to 'truly duplicative' proceedings." *Tekno Prods., Inc. v. Glove Trends Inc.*, No. 19-00091, 2019 WL 7184544, at *6 (D.N.J. Dec. 26, 2019) (quoting *Kedia v. Jamal*, No. 06-6054, 2007 WL 1239202, at *3 (D.N.J. Apr. 25, 2007)) (cleaned up). "As such, the rule applies only to proceedings already before another district court, which involve: (1) the same issues; and (2) the same parties." *Id.* (citing *E.E.O.C.*, 850 F.2d at 971). Indeed, "[t]he Third Circuit applies the first-filed rule where the matters are duplicative and on all fours." *Id.* (quoting *Akishev v. Kapustin*, 23 F. Supp. 3d 440, 448 (D.N.J. 2014)). "The cases must be truly duplicative so that a determination in one case would leave little to be determined in the other case." *Id.* (quoting *Indivior Inc. v. Dr. Reddy's*

*Labs. S.A.*, No. 17-7111, 2018 WL 4921541, at *7 (D.N.J. July 12, 2018), *report and recommendation adopted and aff'd by* 2018 WL 4089031 (D.N.J. Aug. 27, 2018) (McNulty, J.)).

Here, even the Government does not pretend that the parties or issues in the two cases are "on all fours" or "truly duplicative." They plainly are not. Rather, the Government urges that the Court focus instead on the fact that the parties and issues in the two cases "substantially overlap." Mot. 12. While "the Third Circuit has not formally adopted a 'substantial overlap' rule," some district courts "in the Third Circuit have applied the 'substantial overlap' rule and referenced it with approval." *Tekno Prods.*, 2019 WL 7184544, at *9 (citations and internal quotation marks omitted). "Under the substantial overlap rule, . . . the crucial inquiry is whether the issues substantially overlap; there is no requirement that the issues or the parties be identical." *Id.* (citations and internal quotation marks omitted).

Even if a mere "substantial overlap" would suffice, there is no such overlap as to either the parties or issues here. First, the parties in two cases are substantially different. The defendant in this case is the United States Government, and the defendant in the Texas case is a private prison company. The only common party in the two cases is Ms. Juárez.

Second, the issues are also substantially different. This case involves claims arising from the substandard *medical* care Mariee received at the hands of employees of IHSC, an agency of the United States Government that runs the medical clinic at Dilley. This case also involves the cavalier decision by an IHSC licensed vocational nurse to *medically* clear Mariee to travel without having the qualifications or authority to do so, and falsifying her actions. By contrast, the Texas case involves only claims arising from the unsafe and unsanitary *conditions* at Dilley—conditions for which CoreCivic, as the facility's operator, is directly responsible. Indeed, the Government itself *admits* that "the Texas action seeks to hold CoreCivic liable for

allegedly exposing Mariee to crowded and unsanitary conditions, *rather than the medical negligence claims at issue here*." Mot. 13 (emphasis added).[1]

Contrary to the Government's assertion, a handful of allegations in the Complaint here concerning conditions at Dilley do not show that the different legal and factual issues in the two cases are somehow "inextricably intertwined." Mot. 13. Rather, those allegations merely provide context for how Mariee got sick. As the Government acknowledges on the same page of its motion to transfer, Ms. Juárez's claims in this case arise from the substandard *medical* care Mariee received from IHSC personnel, not from the conditions at Dilley. *See id.*

The Government also points to the parties' Rule 26(f) joint report in the Texas case, in which CoreCivic stated its intention to seek discovery concerning the medical care provided to Mariee at Dilley, *see id.*, among numerous other topics such as "the healthcare treatment M.J. received during her lifetime" and "comments made by Plaintiff to Congress or media outlets." Joint Report Under Fed. R. Civ. P. 26(f), *Juárez v. CoreCivic, Inc.*, 5:19-cv-00916-FB (Nov. 27, 2019) (ECF No. 28). But the mere fact that CoreCivic may seek discovery on such topics does not make them "inextricably intertwined" with the issues in this case. Overlapping discovery is simply not enough.

---

[1] As the Government acknowledges, Ms. Juárez "initially brought claims for medical negligence and claims alleging that CoreCivic negligently created unsafe conditions for Mariee, but the [Texas] court has dismissed the medical negligence claims while allowing the remaining claims to proceed." Mot. 5-6. In particular, the Texas court dismissed the medical negligence claims against CoreCivic on the ground that the United States, not CoreCivic, retained responsibility for the medical care provided to Mariee at Dilley: "Relevant to this case, CoreCivic was specifically responsible for providing residents with safe, sanitary living conditions and access to medical facilities, equipment and supplies. ICE was responsible for providing detainees at the facility with medical care." Order Regarding Def.'s Mot. to Dismiss at 1-2, *Juárez v. CoreCivic, Inc.*, 5:19-cv-00916-FB (Oct. 9, 2019) (ECF No. 19). The Texas court thus found that "[n]othing in [CoreCivic's contract] required, or otherwise reflect an undertaking by, CoreCivic to ensure that Mariee received adequate medical care. Rather ICE retained and was responsible for the provision of medical care and to ensure that it did so adequately." *Id.* at 5-6.

**B. 28 U.S.C. § 1404(a) Does Not Support Transfer**

Aside from relying the first-filed rule, the Court seeks a discretionary transfer to the Western District of Texas under 28 U.S.C. §1404(a). Section 1404 provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

"Courts have broad discretion in making determinations under Section 1404(a), and convenience and fairness are considered on a case-by-case basis." *Alvarado*, 2017 WL 2303758, at *5 (internal quotation marks omitted). When, as here, the proposed transferee district would have jurisdiction and venue, "courts conduct a balancing test, which takes a number of private and public interest factors into consideration." *Id.* (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). "The burden of establishing the need for a venue change lies with the party seeking the transfer." *Id.*; *accord Jumara*, 55 F.3d at 879 (same). "It requires a clear and convincing showing that the balance of convenience strongly favors the alternate forum." *Flores v. United States*, 142 F. Supp. 3d 279, 287 (E.D.N.Y. 2015) (denying § 1404(a) transfer of undocumented immigrant's FTCA suit alleging mistreatment by ICE and CBP employees).

Here, the Government has not met its burden to establish the need for a venue change. As in *Alvarado* and other similar FTCA lawsuits brought by undocumented immigrants against the United States arising from wrongful treatment in immigration detention, the relevant private and public interest factors weigh heavily against transferring this case.

**1. The Private Interest Factors Weigh Against Transfer**

"The private interest factors include: (1) plaintiff's choice of forum; (2) defendant's choice of forum; (3) whether the claim arose elsewhere (4) convenience of the parties as indicated by their relative physical and financial condition; (5) availability of compulsory

process over unwilling witnesses; and (6) the location of books and records." *Alvarado*, 2017 WL 2303758, at *5 (citing *Jumara*, 55 F.3d at 879). These factors do not support transfer here.

***Parties' Choices of Forum.*** Ms. Juárez has chosen to bring this action in her home district. *See* Compl. ¶¶ 8, 10. The Third Circuit has held that such a choice "should not be lightly disturbed." *Jumara*, 55 F.3d at 879; *accord Alvarado*, 2017 WL 2303758, at *6 (quoting same). Indeed, "[t]he Plaintiff's choice is 'entitled to greater deference when a plaintiff chooses its home forum.'" *Alvarado*, 2017 WL 2303758, at *6 (quoting *Wm. H. McGee Co., Inc. v. United Arab Shipping Co.*, 6 F. Supp. 2d 283, 289 (D.N.J. 1997)).

The Government, however, seeks to minimize the significance of that directive from the Third Circuit. It argues that this Court should afford "little, if any, weight" to Ms. Juárez's choice because "New Jersey has little connection with the operative facts of the lawsuit, and [she] came to the state only after the alleged tortious conduct." Mot. 21-22. To the contrary, that analysis ignores Mariee's extensive medical treatment at three hospitals in New Jersey and the surrounding area, *see* Compl. ¶¶ 36-41,[2] and the significance of that treatment to issues of liability and damages. And the Court should not ignore the irony of the Government's argument that Ms. Juárez cannot sue in New Jersey based on the Government's wrongful and fraudulent decision to "medically clear" her sick daughter to travel here. *See id.* ¶¶ 30-35. She should not be forced to return to Texas to pursue her claims against the United States.

***Whether the Claim Arose Elsewhere.*** While the claims here arose in Texas, the same was true in *Alvarado* and this Court denied transfer. 2017 WL 2303758, at *6. Indeed, the

[2] Though not mentioned by name in the Complaint, those three hospitals were JFK Medical Center; Jersey Shore University Medical Center; and Children's Hospital of Philadelphia.

federal courts routinely hear cases in which the consequences of wrongful actions elsewhere occur in their districts. *See, e.g.*, *Flores*, 142 F. Supp. 3d at 283-86.

***Convenience of the Parties.*** As this Court has explained, "[a] transfer is disfavored where it 'merely shifts the burden of litigating in a disfavored forum to the plaintiff.'" *Alvarado*, 2017 WL 2303758, at *6 (quoting *NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F. Supp. 2d 317, 322 (D.N.J. 1998)). That is true here. Just as in *Alvarado*, "[t]he Government's sole contention that litigation in New Jersey would be inconvenient for it is that requiring its employee witnesses to travel to New Jersey 'is burdensome' and 'would detract from their public duties.'" *Id.*; *compare* Mot. 24. That argument was not good enough in *Alvarado*, and it is not good enough now. Furthermore, the "[l]ocation of party witnesses is not decisive since it is assumed that the government can require their participation whenever the case is tried." *Flores*, 142 F. Supp. 3d at 287. And "[i]f two days in [New Jersey] is too burdensome, the government can rely on the [IHSC medical personnel] video-recorded depositions, or arrange to have them testify by live video." *Id.*; *accord Alvarado*, 2017 WL 2303758, at *7 ("[T]o the extent that it is inconvenient for federal employees to travel to New Jersey, the Court may permit them to participate by video deposition."). It certainly would not be more convenient for Ms. Juárez to litigate this case in Texas.

***Convenience of the Witnesses.*** As in *Alvarado*, "[t]he Government only points to witnesses who are employed by a private government contractor," CoreCivic (formerly known as the Corrections Corporations of America). 2017 WL 2303758, at *7. But as explained above, the Complaint here alleges wrongdoing by ICE medical personnel, not CoreCivic. In any event, "[w]ith respect to non-party witnesses, the parties can utilize videotaped depositions in lieu of

live testimony, or arrange for live testimony by video, lessening the burden on the witnesses." *Flores*, 142 F. Supp. 3d at 288.

By contrast, many important witnesses are located in New Jersey and the surrounding area, including all of the physicians and other healthcare professionals who treated Mariee over six weeks after she arrived in New Jersey. Traveling to Texas would be highly inconvenient for them. *See Doe v. United States*, No. 3:16-cv-0856, 2017 WL 4864850, at *3 (M.D. Tenn. Oct. 26, 2017) (denying transfer of undocumented immigrant's FTCA lawsuit alleging mistreatment in immigration detention, in part because Plaintiffs, "their counsel, their treating physician (a third-party witness) and their damages witnesses (also third parties), are all in Tennessee," and "video depositions may be taken of any of the Government's witnesses who cannot travel to Tennessee").

***Location of Books and Records.*** As in *Alvarado*, this factor is not significant because "any documentary evidence related to the matter can be reproduced and transmitted electronically to this Court." 2017 WL 2303758, at *7; *see also Flores*, 142 F. Supp. 3d at 288-89 (similar); *Doe*, 2017 WL 4864850, at *3 (similar). In addition, medical records related to Mariee's extensive medical treatment following her release from Dilley are located in this area, not in Texas. *See Flores*, 142 F. Supp. 3d at 289 ("The government does not address evidence located in New York relating to plaintiff's continuing medical issues. . . . A treating physician from New York along with expert medical witnesses will be required.").

**2. The Public Interest Factors Also Weigh Against Transfer**

"The public interest factors include: (1) enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) local interest in deciding local controversies at home; (4) public policies of the fora; and (4) familiarity of the

trial judge with the applicable state law." *Alvarado*, 2017 WL 2303758, at *5 (citing *Jumara*, 55 F.3d at 879). These factors do not support transfer either.

***Practical Considerations.*** As in *Alvarado*, the Government contends that practical considerations favor a transfer to Texas because allowing the case to remain in New Jersey would impose a substantial burden on the Government's witnesses and affect their ability to perform their duties. Mot. 16-17. "This argument also fails to take into account that litigation of this case affects public employees' time regardless of location." *Alvarado*, 2017 WL 2303758, at *7.

The Government also suggests that there would be efficiencies if this case were transferred because of the overlap with Ms. Juárez's lawsuit against CoreCivic in Texas. However, discovery in the two cases will not be coextensive because the issues are substantially different and because there are a number of witnesses (particularly in New Jersey and the surrounding area) who will not be relevant in the Texas litigation. Equally important, that case has progressed far past this one, with discovery currently set to close there in December 2020.

***Local Interests and Public Policies.*** The Government argues that "Texas has a strong interest in deciding controversies at detention facilities where, as here, the events at issue occurred." Mot. 17. This Court rejected the same argument in *Alvarado*, explicitly noting that the plaintiff's allegations against the *federal* government are of national significance:

> Plaintiffs were held in federal detention centers and allege mistreatment by federal officers in violation of federal policies. Immigration, and the treatment of those who have entered the United States without inspection is a matter of national concern. No Texas laws or policies are implicated by this matter. Courts have found that public interests do not warrant a transfer of venue where issues are national in scope. *See Joao Control & Monitoring Systems, LLC v. Ford Motor Co.*, No. 12-1479, 2013 WL 4496644, at *3 (D. Del. Aug. 21, 2013) (finding that this factor is typically neutral in patent matters involving national corporations). Accordingly, this factor does not favor a transfer.

*Alvarado*, 2017 WL 2303758, at *7. Other courts have agreed that "[a]ll states have an interest in the country's policies and practices for processing and detaining asylum seekers." *Doe*, 2017 WL 4864850, at *3; *see also Flores*, 142 F. Supp. 3d at 291 ("[T]he alleged mistreatment of plaintiff was by the national government, giving rise to a national interest in the matters to be litigated."). The same rationale applies here.

***Court's Familiarity With the Applicable Law***. The Government argues that this factor favors transfer because "Texas judges routinely apply Texas law, which is the law that would be applied here." Mot. 18. That rationale is of far greater import when the court will be addressing complex statutory or regulatory issues. As this Court explained in *Alvarado*, "[c]ourts have found this factor to be neutral where the only matters of state law involve common law torts or negligence." 2017 WL 2303758, at *7; *see also Yocham v. Novartis Pharmaceuticals Corp.*, 565 F. Supp. 2d 554, 560 (D.N.J. 2008) ("Disturbing Plaintiff's choice of forum in order to spare this Court the trouble of interpreting Texas law is simply not called for here."); *Flores*, 142 F. Supp. 3d at 290 ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex. The court can ascertain Texas law with help from counsel."). That is the case here.

In sum, the relevant private and public interests overwhelmingly counsel against transferring this case to Texas; such a result would not be "in the interest of justice."

**CONCLUSION**

The Plaintiff, with the Government's blessing, brought her sick daughter Mariee to New Jersey. After six unbearable weeks of watching her daughter deteriorate here, she endured the loss that no parent should experience. Now, when she seeks recompense for its employees' misconduct, the Government wants this Court to send her back to Texas. The unfairness is manifest, and the law does not require or even countenance that result. Plaintiff respectfully requests that the Court deny the Government's motion to transfer.

Dated: October 22, 2020

Respectfully submitted,

*/s/ Paul J. Fishman*
Paul J. Fishman
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102
paul.fishman@arnoldporter.com

R. Stanton Jones
(*pro hac vice* motion pending)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
stanton.jones@arnoldporter.com

*Counsel for Plaintiff*