## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**YAZMIN JUAREZ COYOY, ON HER OWN BEHALF AND AS SURVIVING PARENT OF MARIEE CAMYL NEWBERRY JUAREZ,**

**Plaintiffs,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

Civ. No. 20-2501 (KM) (ESK)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Now before the Court is the motion of the United States to transfer venue of this wrongful death action to the Western District of Texas. For the reasons stated herein, the motion will be denied.

Many immigration law issues revolve around the presence of a human being, which, in everyday life, is not a problematic concept. The United States does not dispute that the plaintiff, Yazmin Juarez Coyoy, is a natural person who lives in New Jersey. But the government contends that she is not a resident here, or indeed anywhere; for venue purposes, she is a kind of Flying Dutchman. Legal fictions, we are taught, are "solemn things,"[1] so it will be necessary to explore further.

I do not make light of this tragic case. The issue at the moment, however, is just venue; whether this action, which will certainly be litigated somewhere,

---

[1] W.S. Gilbert & A. Sullivan, *The Gondoliers,* act II. *See* https://gsarchive.net/gondoliers/web_opera/gond11d.html .

On the other hand, even in immigration law, sometimes presence is just presence. Decades ago, when an Assistant U.S. Attorney, I appeared at a bail hearing for a person accused of illegal reentry to the United States after a prior order of removal and deportation. Asked by the Magistrate Judge to summarize the evidence, I could do no better than to hold up the order and point at the defendant.

will be prosecuted in this location or that. Nothing about that issue would require the government to compromise its position on the merits, adjust the plaintiff's immigration status, or concede the availability of relief. Issues of statutory interpretation aside, what is at stake is mainly the government's convenience.

Yazmin Juarez Coyoy is a migrant from Guatemala. She was detained by U.S. Immigration and Customs Enforcement ("ICE") in Texas shortly after she crossed the border from Mexico, accompanied by her 19-month-old daughter, Mariee Camyl Newberry Juarez. While the two were in ICE custody, Mariee fell ill. According to the complaint, ICE medical staff provided inadequate treatment, which allowed Mariee's illness to progress to a critical state. They then, without proper medical clearance, authorized her transfer to New Jersey by air. Shortly after Marie landed in New Jersey, she was checked into an emergency room and was hospitalized. She died six weeks later, having attained the age of 21 months. Ms. Juarez has filed a complaint against the United States, on behalf of herself and her deceased daughter, alleging wrongful death and medical negligence under Texas state law.[2]

First, the United States argues first that venue is improper under the relevant statute. Ms. Juarez, it says, cannot be deemed to "reside" in New Jersey, or anywhere in the United States, because she does not possess the status of a permanent resident alien. That issue of statutory interpretation must, of course, be resolved. But it does not end there.

Second, the United States argues that even if venue is permissible here, the Court should exercise its discretion to transfer venue to the Western District of Texas, because it would be more convenient for the government to litigate there. The United States is obviously present and well able to defend itself in any district. On the other hand, the transfer sought by the government

---

[2]     Here and in the following section, I summarize the allegations of the complaint. Those allegations, of course, have not been tested by any fact finder.

would subject an indigent plaintiff who is grieving for her dead child to maximum inconvenience.

All that said, the Court must apply the governing venue statute, and would transfer venue if that statute dictated that venue here is improper. I do not, however, believe that the statute requires such a result. Nor does the United States persuade the Court that, as a discretionary matter, the plaintiff's choice of forum should be disturbed. I therefore **DENY** the United States's motion to transfer.

## I.   BACKGROUND

Ms. Juarez, originally from Guatemala, came to the United States with her daughter, Mariee, seeking refugee status. (Compl. ¶ 12.) Ms. Juarez and Mariee crossed the United States-Mexico border into Texas on approximately March 1, 2018. (*Id.*) Soon thereafter, U.S. Customs and Border Patrol apprehended the pair and transported them to an ICE holding facility in McAllen, Texas. (*Id.* ¶ 13.) They were then transferred into ICE custody at that facility, where they were housed with five other mothers and several sick children. (*Id.* ¶¶ 13–15, 17.)

While housed at the Texas Facility, Mariee developed upper respiratory symptoms, including congestion and a productive cough. (*Id.* ¶¶ 3, 19.) ICE medical staff turned her away on multiple occasions. (*Id.*) Eventually, on March 11, 2018, a physician assistant examined Mariee, diagnosed her with an acute upper respiratory infection, and prescribed Tylenol for comfort and honey packs for her cough. (*Id.* ¶ 20.) That physician assistant directed a follow-up in six months. (*Id.*) The next day, Mariee was running a fever of 104.2 degrees and refusing food, as well as suffering from cough, congestion, diarrhea, and vomiting. She was seen by another physician assistant, who prescribed an antibiotic, fever reducers, and oral hydration. (*Id.* ¶ 21.) Three days later, another physician assistant diagnosed an upper respiratory infection, directed continued administration of Tylenol and Pedialite, and scheduled a follow up appointment for a week later. (*Id.* ¶ 24.) On March 21, 2018, a physician

diagnosed Mariee with acute viral bronchiolitis, and prescribed Pedialite, ibuprofen, Zyrtec, and Vicks VapoRub. (*Id.* ¶ 25.) Finally, on March 23, 2018, a nurse examined Mariee's lungs and noted that a referral would be made for her to see a medical provider. (*Id.* ¶ 29.)

On March 25, 2018, ICE staff cleared Mariee and Ms. Juarez for transfer out of family detention to New Jersey, despite Mariee's not having been medically examined that day. (*Id.* ¶¶ 30–32.) The two boarded a plane to New Jersey. (*Id.* ¶ 35.) Soon after landing, Ms. Juarez took Mariee to a pediatrician, and then took her to an emergency room. (*Id.* ¶ 35, 37.) Mariee tested positive for adenovirus and parainfluenza. (*Id.* ¶ 37.) After six weeks of treatment at two different hospitals, Mariee died on May 10, 2018. (*Id.* ¶ 37–39.) The medical examiner concluded that the cause of death was a collapsed lung, inflammation of the lungs, and bronchiectasis. (*Id.* ¶ 39.)

Ms. Juarez brought this suit seeking compensation for Mariee's death. (Compl.) She brings six claims under Texas state law against the United States. Her claims are for negligence, negligence per se, and medical negligence under the Texas Survival Statute and the Texas Wrongful Death Act. (Compl. at 12–18.)

Before bringing this suit, Ms. Juarez brought two other lawsuits in other federal district courts. The first, filed on February 28, 2019, was entitled *Yazmin Juarez Coyoy v. City of Eloy*, Civ. No. 19-01391 (D. Ariz. 2019). In that suit, she sought to hold the City of Eloy, Arizona, responsible for Mariee's death.[3] The dismissal of that case, DE 22, Civ. No. 19-01391 (Nov. 19, 2019), is currently on appeal to the U.S. Court of Appeals for the Ninth Circuit. No. 19-17539 (9th Cir. Dec. 19, 2019). The second case, filed on July 31, 2019, is entitled *Yazmin Juarez Coyoy v. CoreCivic, Inc.*, Civ. No. 19-00916 (W.D. Tex.

---

[3] The City of Eloy is located in Arizona, hundreds of miles from the detention center where Ms. Juarez and Mariee were held. The City apparently was a primary contractor for the ICE detention center in question in this case, which it serviced pursuant to a subcontract with CoreCivic. Ms. Juarez asserts that the City's role as primary contractor gave it a duty of care.

2019). There, she brings claims under Texas law against CoreCivic, the private contractor which operated the ICE facility where Mariee became ill. That case initially included medical negligence claims, which were dismissed; the sole issue remaining is a claim that CoreCivic negligently created unsafe, unsanitary conditions for Mariee. DE 19, Civ. No. 19-00916 (Oct. 9, 2019).

This action, then, contains all the remaining claims of negligent medical care. As required by the Federal Tort Claims Act, it is brought against the United States.

## II.   DISCUSSION

### a.  Whether Venue is Proper

The parties first dispute whether, as a matter of statutory law, venue is proper in the District of New Jersey. I conclude that it is.

Because plaintiff brings her claims pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), venue is governed by 28 U.S.C. § 1402(b). That statute provides that "[a]ny civil action on a tort claim against the United States under subsection (b) of [28 U.S.C. § 1346] may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."

Venue is thus proper in the District of New Jersey only if plaintiff "resides" here.[4] Residency "[f]or all venue purposes" is governed by a definitional section:

> [A] natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled.

28 U.S.C. § 1391(c)(1).[5]

---

[4]     The acts and omissions which form the basis of plaintiffs' complaint occurred in Texas, so the second statutory alternative is unavailable.

[5]     The parties agree that, although Section 1402, the specific venue provision for actions against the United States, does not contain its own definition of residency, the Section 1391(c) definition of "Residency.— For all venue purposes" applies here. (DE 11-1 at 8; DE 19 at 7–8.)

Ms. Juarez asserts, straightforwardly enough, that venue is proper in this district because she is a natural person who resides in the District of New Jersey. The government does not dispute factually that she lives here and intends to remain for an indefinite period. The United States asserts, however, that Ms. Juarez, as an immigrant not "lawfully admitted for permanent residence in the United States," cannot be deemed to "reside" in the District of New Jersey, or indeed anywhere else in the United States. If that is so, venue can only be based on the location of the alleged medical malpractice, *i.e.,* the Western District of Texas.

### i.      Interpretation of § 1391(c)(1)

I conclude that Ms. Juarez is a resident of the District of New Jersey, and that venue is therefore proper here.

Section 1391(c)(1) does not specifically address the residential status of an alien not lawfully admitted to the United States. To that extent it is ambiguous,[6] and I therefore employ the usual tools of statutory interpretation. To summarize, I find that Congress did not intend to extend "resident" status to all individuals who are currently present in a district, even if they subjectively intend to live there permanently. Rather, Congress intended to cover only those individuals who have the *lawful* intent to remain in the district. Because Ms. Juarez is not merely present, but currently seeks asylum in the United States, she is capable of forming such a lawful intent to remain.

<u>Ambiguity and the need for statutory construction</u>

Initially, I find that § 1391(c), as it applies to § 1402, is at best ambiguous in relation to the government's position. Its definition specifically embraces "a natural person, *including* an alien lawfully admitted for permanent residence in the United States." (Emphasis added.) The Court must determine whether the "including" clause is intended as an example or a prerequisite:

---

[6]      I mean "ambiguous" in relation to the government's position that resident status for Ms. Juarez is precluded as a matter of law. Ms. Juarez argues that residence and domicile have fixed meanings, and that her status is clear.

"[T]he subsection raises the question, 'is the pointed reference to a lawfully admitted alien merely an example of a natural person or does it impose a lawfulness requirement?'" *Luna v. United States*, 2021 WL 673534, 2021 U.S. Dist. LEXIS 32757 at *4 (W.D. Wash. Feb. 22, 2021).

The statutory text does not definitively resolve the issue. I therefore attempt to ascertain the legislative intent, employing the tools of statutory interpretation: "we look to the statute's language, structure, subject matter, context, and history—factors that typically help courts determine a statute's objectives and thereby illuminate its text." *Almendarez-Torres v. United States*, 523 U.S. 224, 228, 118 S. Ct. 1219 (1998).

> Key statutory terms in context

I first consider the definitions of the key terms of the venue statutes, here underlined:

> "Any civil action on a tort claim against the United States . . . may be prosecuted . . . , in the judicial district where the plaintiff <u>resides</u> . . . ." 28 U.S.C. § 1402(b).

> "[A] <u>natural person</u>, <u>including</u> an alien lawfully admitted for permanent residence in the United States, shall be deemed to <u>reside</u> in the judicial district in which that person is <u>domiciled</u>." 28 U.S.C. § 1391(c)(1).

But because words take meaning from their surroundings, I do not consider only their definitions. Rather, I apply some basic principles of statutory construction to place these terms in their context. This approach, while it does not quite get us to a result, narrows the range of possibilities.

A "<u>natural person</u>" is simply a human individual, as opposed to a legally created entity, like a partnership or corporation:

> **person** (13c)  1.  A human being. — Also termed natural person.

B. Garner, ed., *Black's Law Dictionary* (11th ed. 2019).

To "<u>include</u>," in common English, is "to take in or comprise as a part of a whole or group." Merriam-Webster online dictionary, <u>https://www.merriam-</u>

webster.com/dictionary/including. In a happy convergence, it appears to mean
the same thing in legal English:

> **include**  vb. (15c) To contain as a part of something. • The
> participle including typically indicates a partial list <the plaintiff
> asserted five tort claims, including slander and libel>. But some
> drafters use phrases such as including without limitation and
> including but not limited to — which mean the same thing.

*Black's Law Dictionary* (11th ed. 2019) (consulted online in Westlaw). *See also*
Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*
132–33 (2012) ("15. Presumption of Nonexclusive 'Include'" / "The verb to
include introduces examples, not an exhaustive list.")

The case law follows suit. There are many examples, but I confine myself
to a few from the U.S. Supreme Court and the U.S. Court of Appeals for the
Third Circuit. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)
("The text employs the terms 'including' and 'such as' in the preamble
paragraph to indicate the 'illustrative and not limitative' function of the
examples given."); *Herb's Welding v. Gray*, 470 U.S. 414, 423 n.9 (1985) ("By
the use of the term 'including,' Congress indicated that the specifically
mentioned occupations are not exclusive."); *United States v. MacEwan*, 445
F.3d 237, 243 n.6 (3d Cir. 2006) ("Congress' special inclusion of the term
'including by computer' denotes its special concern for the transmission of
child pornography by electronic means."); *Singh-Kaur v. Ashcroft*, 385 F.3d 293,
298 (3d Cir. 2004) ("Use of the term 'including' suggests that Congress
intended to illustrate a broad concept rather than narrowly circumscribe a
term with exclusive categories."); *In re SGL Carbon Corp.*, 200 F.3d 154, 160
(3d Cir. 1999) (stating that a statute in which the word "including" was
followed by a list of factors "strongly suggests those factors are not
exhaustive").

In statutes, then, the category may commonly be followed by "including"
and a list of items or subcategories that fall within it. The analogy would be to
the taxonomic categories of genus and species. The default implication is that

the listed items do not exclude others, but are a subset of that larger class. Logically, "including" is not a term of exclusion; it means the same thing as the cautious contract drafter's "including but not limited to."

Section 1391(c) announces a scope of coverage so broad as to embrace the entire human race: "natural persons." It specifies that permanent resident aliens are "includ[ed]," but never states or implies that others are excluded. Indeed, the category of permanent resident aliens cannot possibly be exclusive; such an interpretation would rule out U.S. citizens, an absurd result. Permanent resident aliens, then, are a subclass of those natural persons who may be considered residents for venue purposes.

The default definition of "includes," like most principles of statutory construction, is limited by another. In daily life, when we see the list "peaches, strawberries, grapes, etc.," we naturally assume that "etc." does not include "the King of Norway." In statutory construction, too, nonexclusive examples are considered to imply only such other examples as are similar in some relevant respect, according to the canons of ejusdem generis ("of the same kinds, class, or nature") and noscitur a sociis ("a word is known by the company it keeps"), *Yates v. U.S.*, 574 U.S. 528, 549–50 (2015) ("The *noscitur a sociis* canon instructs that when a statute contains a list, each word in that list presumptively has a 'similar' meaning. A related canon, *ejusdem generis*[,] teaches that general words following a list of specific words should usually be read in light of those specific words to mean something 'similar.'") (cleaned up). To look ahead, I find that the example of permanent residents, though not exclusive, suggests that other examples must possess some common, relevant feature. That common feature is residence/domicile that is *lawful*, even if it does not rise to the level of legal permanent resident or citizenship status. More about that later.

 "Residence" simply means the place where one lives (and is ordinarily defined by contrast with domicile, *see infra*). *See Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972). Now Ms. Juarez surely must "reside" somewhere—

*i.e.*, she logically must occupy a house, an apartment, or a tent, at some physical location on planet Earth. That physical location, as it happens, lies within this District—indeed, it was the defendant itself which transported her from Texas to New Jersey. The government nevertheless proffers that Ms. Juarez does not reside in this district, and the implication of its view is that she does not reside anywhere.[7]

This statute has a second step: it further restricts the definition of residence by equating it with domicile. Domicile has a fixed meaning at law. It is "an individual's 'true, fixed and permanent home and place of habitation. It is the place to which, whenever [s]he is absent, [s]he has the intention of returning.'" *Frett-Smith v. Vanterpool*, 511 F.3d 396, 402 (3d Cir. 2008) (quoting *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006)). Domicile is defined according to a party's intent; it is "established by a party's physical presence in a state with an intent to remain there indefinitely." *Id.* (courts consider numerous factors, including "establishment of a home, place of employment, location of assets, registration of a car, and generally the center of one's business, domestic, social and civic life"). "Permanent" is, of course, a relative term in human affairs. If a "new state is to be one's home for an indefinite period of time, [s]he has acquired a new domicile." *Id.* (quoting *Krasnov v. Dinan*, 465 F.2d at 1300–01. So domicile may be defined, briefly, as (a) residence plus (b) intent to remain. *See id.* at 1300.

"Including," then, ordinarily means "including but not limited to," so the specification of permanent residents does not exclude other persons from being treated as residents/domiciliaries. Moreover, there seems to be no dispute that Ms. Juarez meets the usual tests of residence and domicile. Nothing about the usual and ordinary definitions of the key terms of the statute appear to support the government's position that Ms. Juarez cannot be a resident because she is not a permanent legal resident.

---

[7]     Domicile in Guatemala is a possibility, but she has not been present there for three years, and has no intent to return.

<u>Case law and legislative background of the 2011 amendment</u>

I do conclude, however, that "resident" status under the statute, even if it does not rise to the level of legal permanent resident status, must be lawful. That gloss on the statute is implied by the pre-2011 case law background, the problem Congress perceived it was addressing when it amended the statute in 2011,[8] and post-2011 case law interpretations of the statute.

The statutory language in question is the product of a 2011 amendment, and I am to "presume legislatures act with case law in mind." *Abuelhawa v. United States*, 556 U.S. 816, 821 (2009). Before 2011, courts "had long held that non-citizens are not residents of any district of the United States for purposes of venue, regardless of where they might live." *Luna*, 2021 U.S. Dist. LEXIS 32757 at *2. The rule dates back at least to *Galveston, H. & S.A. Ry. Co. v. Gonzales*, 151 U.S. 496, 506–07 (1894). *See also Arevalo-Franco v. INS*, 889 F.2d 589, 590 (5th Cir. 1990); *Li v. Chertoff*, 2008 U.S. Dist. LEXIS 96756, 2008 WL 4962992 at *2 (N.D. Cal. Nov. 19, 2008).

Some courts, however, had created ad hoc exceptions to that harsh rule under certain circumstances. *See Castellon-Contreras v. INS*, 45 F.3d 149, 152–

---

[8]     Legislative history is not the preferred method of statutory interpretation, but it may shed light on an ambiguous statute. *See Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 244 (3d Cir. 2009) ("[R]esort to legislative history is appropriate 'when necessary to interpret ambiguous statutory text.") (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004)); *In re Mehta*, 310 F.3d 308, 311 (3d Cir. 2002) ("We look to the text of a statute to determine congressional intent, and look to legislative history only if the text is ambiguous."). Both sides here substantially cite and rely on legislative history.

    Plaintiffs assert that § 1391(c)(1) is not ambiguous, relying on *Alvarado v. United States*. There, Judge Arleo concluded that "[t]he plain text of 1391(c)(1) authorizes *all* non-citizens—regardless of LPR status—to establish residency where they are domiciled." 2017 WL 2303758, 2017 U.S. Dist. LEXIS 80894 at *5 (D.N.J. May 25, 2017). She reasoned that "[t]he ordinary meaning of 'natural person' is an individual," and that § 1391(c)(1) "does not limit the term 'natural persons' in any way, and thus includes *all* natural persons." *Id.* at 5–6; *see also FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning"); *Flores v. United States*, 108 F. Supp. 3d 126, 130 (E.D.N.Y. 2015) ("When Congress intend[s] to exclude . . . it [says] so."). As explained herein, I believe the legislative intent largely vindicates Judge Arleo's interpretation, though I arrive at it by a less direct route.

54 (7th Cir. 1995). There, the Seventh Circuit considered an immigrant's application for waiver of deportation under § 212(c) of the Immigration and Nationality Act, which permitted aliens "returning to lawful unrelinquished domicile of seven consecutive years" to be admitted into the country. *Id.* at 151 (Section 212(c) was subsequently repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, also known as IIRARA, Pub. L. 104-208, Div. C, Title III § 304(b), Sept. 30, 1996, 110 Stat. 3009-597). Castellon-Contreras's eligibility for the provision depended on whether he had been "lawfully domiciled" in the United States prior to becoming a lawful permanent resident. *Id.* at 151–52. The court concluded that "aliens can become lawful domiciliaries without first obtaining LPR status," reasoning that "domicile" only requires that the alien be capable of "form[ing] the intent to remain in the United States indefinitely." *Id.* at 153–54. It then reasoned that Castellon-Contreras was able to establish lawful domicile after he applied for amnesty, but not before, when he was residing in the country illegally. *Id.* at 154. It further noted that Castellon-Contreras was able to form the requisite intent to remain in the country indefinitely despite the fact that amnesty only entitled him to "temporary" residence, because he was able to transition from that temporary status to LPR status as long as he resided in the United States continuously. *Id.* at 154.[9]

It was against that backdrop that Congress, in 2011, inserted the language stating that natural persons reside in the judicial district in which they are domiciled. Federal Courts Jurisdiction and Venue Clarification Act, Pub. L. 112-63, 125 Stat. 758 (Dec. 7, 2011). The House Report in connection with the 2011 amendment explicitly referred to that case law, and stated that

---

[9]     As the Seventh Circuit noted, in coming to these conclusions it departed from the Board of Immigration Appeals' interpretation, which required lawful permanent resident status to establish lawful domicile. *Id.* at 152. The Fourth and Ninth Circuits had agreed with the BIA's interpretation because they afforded it deference, *Chiravacharadhikul v. INS*, 645 F.2d 248 (4th Cir. 1981); *Castillo-Felix v. INS*, 601 F.2d 459 (9th Cir. 1979), while the *Castellon-Contreras* approach was endorsed in the Second Circuit, *Lok v. INS*, 548 F.2d 37 (2d Cir. 1977).

the amendment was a "clarification" which would have the effect of permitting "permanent resident aliens domiciled in the United States to raise a venue defense." H.R. Rep. 112-10, 23, 2011 U.S.C.C.A.N. 576, 580 (Feb. 11, 2011). The Report added in a footnote that aliens are only capable of obtaining "lawful domicile" in the United States if they have the ability "under the immigration laws to form the intent to remain in this country indefinitely." *Id.* at 580 n.16 (citing *Castellon-Contreras*, 45 F.3d at 153). "Such an interpretation of domicile under the venue statute as including lawful intent to remain would foreclose the possibility that an undocumented alien would be regarded as a domiciliary of the United States for venue purposes." *Id.* It is not any great stretch to infer that Congress does not pass statutes condoning unlawful activity; it follows that the intent to remain must be a lawful intent.

I read this history as indicating that Congress inserted the 2011 amendment language in order to do two things:

> (a) deny "resident" status to aliens who were *merely* undocumented and illegally present in the United States, because they could not possess a lawful intent to remain; but

> (b) grant "resident" status to legal permanent residents, because they are capable of having a lawful "intent to remain in this country indefinitely." *Id.* Congress noted explicitly that aliens can obtain "lawful domicile" by having such a lawful intent.

What the statute omits is the middle case: an alien who is lawfully present in the country, but not (or not yet) admitted to permanent legal resident status. Should such intermediate-status aliens be treated as falling under category (a) or category (b)? The rationale of some pre-2011 case law, specifically cited in the 2011 legislative history, suggests that the correct answer is category (b). An alien lawfully present in the country, who can harbor a *lawful* intent to remain, fits that rationale, even if he or she has not attained permanent resident status. Such an alien shares the relevant characteristic with the permanent resident which the statute names as an example. And that alien's inclusion makes sense under the statutory construction principles of *ejusdem generis* and *noscitur a sociis.*

The United States disagrees. It claims that this reading is impermissible because it would render § 1391(c)(1)'s reference to "alien[s] lawfully *admitted for permanent residence*" pointless, thus violating the statutory canon against superfluity. (DE 11-1 at 9 (citing *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").) That argument is unpersuasive, for a couple of reasons. First, it could be applied to any nonexclusive example that follows the word "including." Such examples are included, not because they add to the general category, but because they exemplify it, or are deserving of particular emphasis.[10] So understood, they are redundant by design—a feature, not a bug. Second, the government's principle of economy cannot account for Congress's having chosen such a roundabout way of expressing a very simple thought: "U.S. citizens and lawfully admitted permanent residents." Instead, it announced the comprehensive category of "natural persons," specifying that legal permanent residents were included, but with the clear implication that others—most obviously, U.S. citizens—were included as well.

I therefore agree with the post-2011 *Luna* case that § 1391(c)(1), as amended, was not restricted to "alien[s] lawfully admitted for permanent residence in the United States," but also embraces others who similarly can form the lawful intent to remain in the United States indefinitely. 2021 U.S. Dist. LEXIS 32757 at *4. So understood, the subcategory of permanent resident aliens is an "illustrative application" of the general category. *See Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)

---

[10]     The explicit reference to legal permanent residents may reflect that their exclusion seems particularly harsh. It is common for statutes to include as examples areas of particular concern, without meaning to exclude others. *See, e.g., United States v. MacEwan*, 445 F.3d 237, 243 n.6 (3d Cir. 2006) ("'including by computer' denotes [the legislature's] special concern for the transmission of child pornography by electronic means" but does not imply that other forms of distribution are permitted); cases cited at p. 8, *supra*.

("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *Alvarado*, 2017 U.S. Dist. LEXIS 80894 at *6–7 ("Here, the general principle is that 'natural persons' can establish residency where they are domiciled, and individuals with LPR status are merely an illustrative example of natural persons.").

Congress did not intend that an undocumented immigrant's mere presence in the United States would suffice to support "residency" in a district for purposes of venue under § 1391(c)(1). That exclusion, however, rested on a particular rationale. That rationale is that such a person would be legally incapable of harboring the lawful intent to remain in the United States permanently. That same rationale implies that a person who *is* capable of forming such an intent may, consistent with Congress's intent, be eligible to be considered a "resident" within the meaning of 28 U.S.C. §§ 1391(c)(1) and 1402(a).

I hold that a natural person is a resident of any district in which he or she is *lawfully* domiciled. Such a person is one who, even if not a legal permanent resident, lives in the district and possesses a lawful intent to remain.[11]

---

[11]    *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018), cited by the United States, does not persuade me otherwise. There, the Federal Circuit considered whether a foreign patent defendant could mount a venue defense. It held that the 2011 amendment was a "modest adjustment limited to natural persons," which did not affect established case law regarding venue for foreign corporations. *Id.* at 1356, 1358–60. While the *HTC* court stated in passing that the 2011 amendments applied to immigrants with "permanent resident status," *id.* at 1359, it did not analyze that issue, and the statement was irrelevant to its holding. It must be regarded as dictum.

I also reject the government's reliance on *Najera v. United States*, 2016 WL 6877069 at *7 (E.D. Va. Nov. 22, 2016), which is actually consistent with the rule I adopt today. *See* n.11, *infra*.

###### ii.  Application of "Lawful Intent to Remain" Test to Ms. Juarez as an Asylum Applicant

I conclude that Ms. Juarez meets the § 1391(c) test. As an applicant for asylum, she possesses, not the bare intent, but a *lawful* intent, to remain in the District of New Jersey indefinitely.

The government does not seem to dispute that while her application for asylum is pending, Ms. Juarez is lawfully permitted to remain in the United States indefinitely.[12] It appears she has every intention of remaining in the U.S., and specifically in New Jersey. (Compl. ¶¶ 8, 10; DE 11-1 at 8.) Ms. Juarez's application for asylum is "an objective and official manifestation of [her] intent to reside permanently in the United States" and so fits well within the requirements of § 1391(c)(1). *Luna*, 2021 U.S. Dist. LEXIS 32757 at *5 (quoting *Nwozuzu v. Holder*, 726 F.3d 323, 334 (2d Cir. 2013)). And that asylum application, if granted, will furnish a legal basis to do so.[13]

---

[12]  To be clear, an application for asylum, even if granted, is not tantamount to a grant of legal permanent resident status. The Third Circuit has stated that a grant of asylum "'places the individual in valid immigration status but is not an admission.'" *Sanchez v. Sec'y of DHS*, 967 F.3d 242, 246 (3d Cir. 2020) (quoting *In re H-G-G-*, 27 I. & N. Dec. 617, 635 (AAO 2019)), *cert. granted* 2021 WL 77237 (Jan. 7, 2021). And if the asylum application is denied, of course, it may extinguish any lawful intent to remain.

[13]  An instructive contrast is *Najera v. United States*, 2016 WL 6877069 at *7 (E.D. Va. Nov. 22, 2016). There, the plaintiff sought to establish domicile based on his Temporary Protected Status ("TPS"). *Id.* A person admitted pursuant to TPS, however, "shall not be considered to be permanently residing in the United States under color of law," 8 U.S.C. § 1254a(f)(1), and indeed is instead "considered as being in, and maintaining, lawful status as a *nonimmigrant*," *id.* § 1254a(f)(4) (emphasis added). That individual's right to remain in the country is limited to the length of the TPS designation, which is temporary by definition. 8 U.S.C. § 1254a(b)(2). There is no pathway from TPS status to lawful permanent resident status or citizenship (unless, of course, the individual has some separate and independent basis to apply for such status). It follows that TPS status cannot be considered a basis for any lawful intent to stay in the U.S. indefinitely or permanently. S*ee Graham v. INS*, 998 F.2d 194, 196 (3d Cir. 1993) (holding, with respect to different statute, that temporary immigration status cannot form basis for lawful domicile).

16

Ms. Juarez therefore has the requisite lawful intent that is required to establish "residency," defined as domicile for venue purposes. H.R. Rep. 112-10, 23, 2011 U.S.C.C.A.N. 580 n.16. The concept of domicile is not unique to the law of venue, of course, and is frequently litigated. Numerous courts have concluded that an asylum applicant, though not a legal permanent resident, may be a lawful domiciliary of the United States. *See Castellon-Contreras*, 45 F.3d at 154 ("aliens can become lawful domiciliaries without first obtaining LPR status"); *Flores*, 108 F.3d at 131 ("'domicile' can be established by an 'intent to remain' that is 'legal under immigration laws" such as an application for asylum) (quoting *Lok*, 681 F.2d at 109 ("an alien d[oes] not have to be a permanent resident to harbor a lawful intent to remain")); *In re Mendoza*, 597 B.R. 686, 693–94 (Bankr. S.D. Fla. 2019) ("an immigrant legally can form the permanent intention required to establish a U.S. domicile if the immigrant lawfully can reside in the U.S. indefinitely" pursuant to an application for political asylum); *see also Morel v. INS*, 90 F.3d 833, 839 (3d Cir. 1996) (asylum refugees can establish domicile), *vacated on other grounds*, 144 F.3d 248 (3d Cir. 1998).

Because Ms. Juarez is a resident/domiciliary of New Jersey, I conclude that venue is proper in New Jersey.

### b. Discretionary Transfer of Venue Pursuant to 28 U.S.C. § 1404

The United States argues that even if venue is proper in New Jersey, the Court should exercise its discretion to transfer the case to the Western District of Texas. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404. Courts have "broad discretion in making determinations under Section 1404(a), and convenience and fairness are considered on a case-by-case basis." *Alvarado*, 2017 WL 2303758, 2017 U.S. Dist. LEXIS 80894 at *12–13 (quoting *Linwood Trading Ltd.*, 2015 U.S. U.S. Dist. LEXIS 115395, 2015 WL 5098117 at *1 (D.N.J. Aug. 28, 2015)).

Before I discuss these factors, however, I will consider the threshold assertion of the United States that I should transfer this case based on the "first-filed" rule.

### i. First-Filed Rule

Under the "first-filed" rule, I have discretion to transfer a later-filed case if it is sufficiently similar to a case previously filed in another jurisdiction. *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 959, 971 (3d Cir. 1988). The rule, however, "is not a 'mandate.'" *Tekno Prods., Inc. v. Glove Trends Inc.*, 2019 WL 7184544 at *5 (D.N.J. Dec. 26, 2019). A court may deviate from the rule where there are "rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping." *Id.* (quoting *EEOC*, 850 F.2d at 972); *FMC Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, 744 (E.D. Pa. 2005) (departure from first-filed rule is permissible where justice requires); *see also Chavez v. Dole Food Company, Inc.*, 836 F.3d 205, 210 (3d Cir. 2016) ("Application of the rule is discretionary.").

The parties disagree over the proper standard for evaluating whether an action is "first-filed." Each relies on *Tekno Products*, wherein Magistrate Judge Kiel noted that courts in the Third Circuit disagree as to the required extent of overlap between the earlier and later filed matters. On one view, the later-filed matter must be "truly duplicative" of the earlier case, in the sense of including "(1) the same issues; and (2) the same parties"; a contrary view is that the matters need only have "substantial overlap" in their issues and the parties need not be identical. 2019 WL 7184544 at *7, 9. The requirement of "same issues" and "same parties" comes from *EEOC*, 850 F.2d at 971, but Judge Kiel noted that the trend among some district court decisions has been to relax that standard. *See GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 2005 WL 1116318 at *9 (D.N.J. May 10, 2005) (substantial overlap test); *see also Nature's Benefit, Inc. v. NFI*, 2007 WL 2462625 at *3 (D.N.J. Aug. 27, 2007) (same); *Law Sch. Admissions Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 724 (E.D. Pa. 2015) (same); *Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 457

(E.D. Pa. 2013) (same). Judge Kiel ultimately concluded that the "substantial overlap" test was proper, but held that both tests were satisfied in any event. *Id.* 7–9.

I conclude that the first-filed rule retains the "same issues" and "same parties" requirement set forth in *EEOC*. While it does appear that some district courts have strayed from that test over time, the Third Circuit has not. *See Honeywell Int'l Inc. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 502 Fed. Appx. 201, 205 (3d Cir. 2012) ("[T]he first-filed rule ordinarily counsels deference to the suit that was filed first, when two lawsuits involving the same issues and parties are pending in separate federal district courts."); *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 334 n.6 (3d Cir. 2007) ("The issues must have such an identity that a determination in one action leaves little or nothing to be determined in the other."). Many district courts in this district have acknowledged as much. *MacLean v. Wipro Ltd.*, 2020 U.S. Dist. LEXIS 227886 at *16 (D.N.J. Dec. 4, 2020) (same parties, same issues required); *Eagle Pharms., Inc. v. Eli Lilly & Co.*, 2018 U.S. Dist. LEXIS 121527 at *7 (D.N.J. July 20, 2018) (same); *Atanassov v. Amspec Servs., LLC*, 2016 WL 740269 at 2 (D.N.J. Feb. 24, 2016). In *Atanassov*, Judge Wolfson opined that some district courts in the Third Circuit had strayed from the Third Circuit's instruction in *Grider* that the issues between the actions must be so similar that a decision in one case would "leave little or nothing to be determined in the other." 2016 WL 740269 at *2 n.3. She disagreed with those cases' characterization of the *Grider* rule as dictum, finding instead that it was necessary to its decision. *Id.* I agree.

The first-filed rule does not bar the prosecution of this action in the District of New Jersey. These cases do not involve the same parties or the same issues. The *CoreCivic* action, brought against a private contractor, asserts claims based on the inhumane and unsanitary conditions in the ICE facilities. This action, brought against the United States, asserts claims of medical negligence. Because the first-filed rule does not apply, I will not transfer this

case on that basis.[14] Nor would the *City of Eloy* case justify transfer to the Western District of Texas, as that case is pending in the District of Arizona.

### ii. Balancing the § 1404(a) Factors

Since the first-filed rule does not apply, I must consider whether to transfer this case "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "Courts have 'broad discretion in making determinations under Section 1404(a), and convenience and fairness are considered on a case-by-case basis.'" *Alvarado*, 2017 WL 2303758 at *5 (quoting *Linwood Trading Ltd. v. American Metal Recycling Servs.*, 2015 WL 5098117 at *1 (D.N.J. Aug. 28, 2015)).

To determine whether transfer is appropriate under 28 U.S.C. § 1404, courts conduct a balancing test, taking both the public and private interest factors into consideration. The Third Circuit set forth those factors in *Jumara v. State Farm Insurance Company*. 55 F.3d 873, 879 (3d Cir. 1995).

The private interest factors include:

(1) Plaintiff's choice of forum; (2) defendant's choice of forum; (3) whether the claim arose elsewhere; (4) convenience of the parties as indicated by their relative physical and financial condition; (5) availability of compulsory process over unwilling witnesses; and (6) the location of books and records.

*Id.* The public interest factors include:

(1) enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) local interest in deciding local controversies at home; (4) public policies of the fora; and (5) familiarity of the trial judge with the applicable state law.

---

[14]     Even if the "substantial overlap" test applied, I would decline to transfer the case as a matter of discretion, based on the disparity in the parties' resources and the hardship to Ms. Juarez should she be required to litigate this case in Texas. *Chavez*, 836 F.3d at 210; *Wheaton Indus., Inc. v. Aalto Scientific, Ltd.*, 2013 WL 4500321 at *2 (D.N.J. Aug. 21, 2013) ("In deciding a motion to dismiss, stay, or transfer pursuant to the first-to-file rule, a court must consider the same factors applicable to a motion to transfer under § 1404(a)"). *See* discussion of the venue factors in section II.b.2, immediately following.

*Id.*

Private Factors

I view the private factors as weighing heavily in favor of retaining venue here. The dispute over these factors reduces to this:

(a) whether the United States Government, present in every district and possessing nearly unlimited resources, should litigate a suit in New Jersey; or

(b) whether I should require a destitute, grieving refugee from an impoverished nation to repeatedly make an 1,800 mile trip from New Jersey to Texas to litigate her case.[15]

I conclude that the private interest factors point to New Jersey as the preferable forum.

First, the convenience of the parties, as indicated by their relative physical and financial condition, clearly weighs in favor of Ms. Juarez. The United States has virtually unlimited resources. It maintains offices and has an appointed or acting United States Attorney in every district, including this one. While occasionally requiring government witnesses to appear in New Jersey would "detract from their public duties," I do not find that concern sufficient to justify transfer. *See Alvarado*, 2017 WL 2303758 at *6 (rejecting "[t]he Government's sole contention that litigation in New Jersey would be inconvenient for it . . . [because it would] require its employee witnesses to travel to New Jersey . . . ."). Indeed, to the extent it would be a burden for a federal employee to travel to New Jersey, the government could apply to conduct depositions by video. *Id.* at 7. In contrast, Ms. Juarez is a refugee from Guatemala, a country which is the fifth poorest in the region of Latin America and the Caribbean, with persistently high rates of poverty and inequality, and a GDP per capita of $ 4,549 in 2018. The World Bank in Guatemala: Overview, The World Bank, https://www.worldbank.org/en/country/guatemala/overview (last updated September 4, 2020).

---

[15] I set aside travel difficulties occasioned by the COVID-19 pandemic, which may affect both sides and which, if vaccination proceeds at current rates, may abate.

It is unclear, even assuming that Ms. Juarez is authorized to work in the United States, whether she has marketable skills sufficient to finance living expenses plus numerous trips to Texas. There can be no question that Ms. Juarez would be extremely inconvenienced by transfer, while the United States would suffer very little inconvenience by continuing to litigate here.[16]

Second, Ms. Juarez has chosen to bring this action in New Jersey, and that choice "should not be lightly disturbed." *Jumara*, 55 F.3d at 879; *Alvarado*, 2017 WL 2303758 at *6. That choice is "entitled to greater deference when a plaintiff chooses [her] home forum." *Alvarado*, 2017 WL 2303758 at *6 (quoting *Wm. H. McGee Co., Inc. v. United Arab Shipping Co.*, 6 F. Supp. 2d 283, 289 (D.N.J. 1997)). While courts do often give less weight to the plaintiff's forum choice if the events of the suit occurred almost *exclusively* in another forum, *Janosko v. United of Omaha Life Ins. Co.*, 2016 WL 4009818 at *3 (citing *Nat'l Prop. Inv'rs VIII v. Shell Oil Co.*, 917 F. Supp. 324, 327 (D.N.J. 1995)), that is not the case here. Numerous important events from this suit took place in New Jersey. The government transported Ms. Juarez and Mariee here. Mariee spent six weeks in New Jersey hospitals, where she tragically died. To be sure, the medical care given Mariee in Texas gives rise to critical issues in this case, but Mariee's death in New Jersey is an essential fact as well. It is thus not true that this district has "little connection with the operative facts of the lawsuit,"

---

[16]    The United States asserts that Ms. Juarez would not be inconvenienced by litigating this case in West Texas because she already has a pending suit against CoreCivic there. That case, however, would be governed by the general venue provision for suits between private parties, and Ms. Juarez would have to establish that a New Jersey Court has personal jurisdiction over Corecivic, a Maryland corporation with its principal place of business located in Tennessee. *See Bliss v. CoreCivic, Inc.*, 2018 WL 8783789 at *3 (D. Nev. Nov. 21, 2018) (noting where Corecivic is incorporated and where its principal place of business is located); *see also* 28 U.S.C. § 1391(b) (in suits between private parties, there is no provision creating venue where the plaintiff resides; venue lies where the defendant resides or where the events giving rise to the claim occurred). That Ms. Juarez has no choice but to litigate her suit against CoreCivic in Texas does not imply it is convenient or affordable for her to litigate a second suit there.

*Wm. McGee & Co.*, 6 F. Supp. 2d at 290, or that "the nucleus of operative facts is outside" New Jersey, *Fortay v. Univ. of Miami*, 1994 WL 62319 at *8 (D.N.J. Feb. 17, 1994).[17]

Third and fourth, I recognize that the United States prefers to litigate in Texas and that the tortious conduct in this case occurred in Texas. Those considerations are relevant, but I do not give them controlling weight. The United States has the resources to easily litigate this case anywhere in the country. (Indeed, that reality is reflected in the specialized venue statute for actions against the United States, which permits suit to be brought where plaintiff resides. *Compare* 28 U.S.C. § 1402 with 28 U.S.C. § 1391(b).) The government stresses that many witnesses and sources of proof are located in Texas, and that is surely true. But at least some witnesses and sources of proof—notably, Ms. Juarez, the medical caregivers during the last six weeks of Mariee's life, and the evidence of cause of death—are located in New Jersey. *See Alvarado*, 2017 WL 2303758 at *6; *Flores*, 142 F. Supp. 3d at 283–86.

Fifth, the parties both acknowledge that important nonparty witnesses are present both in Texas and New Jersey. Such witnesses can be deposed by videotape or examined at trial via video, irrespective of whether this case is tried in Texas or in New Jersey. (DE 11-1 at 24 n.7; DE 19 at 16–17); *see also Flores*, 142 F. Supp. 3d at 288 ("With respect to non-party witnesses, the parties can utilize videotaped depositions in lieu of live testimony, or arrange for live testimony by video, lessening the burden on the witnesses."). I thus do not consider the convenience of nonparty witnesses or their susceptibility to subpoena to weigh strongly either way.

---

[17]    Even if that were the case, it would not change my conclusion, as courts have been clear that the fact that the events of the suit occurred in another forum only means a plaintiff's choice is given *less* weight, not *no* weight. *Janosko*, 2016 WL 4009818 at *6; *Alvarado*, 2017 WL 2303758 at *6 (affording only "diminished" weight to plaintiff's selection of New Jersey because the tortious conduct in question took place in Texas). Notably, 28 U.S.C. § 1402 gives plaintiffs the right to sue in their home state even when the events in question occurred in another state, so it is clear that this state of affairs was contemplated by Congress when it passed that statute.

Sixth, and last, while there may be books and records in Texas, there are also books and records in New Jersey. (DE 19 at 17 (noting that Mariee's medical records relating to her extensive treatment in New Jersey are located here).) This factor, in any event, has little significance in an age of electronic record keeping. *Alvarado*, 2017 WL 2303758 at *7 ("any documentary evidence related to the matter can be reproduced and transmitted electronically to" New Jersey).

Public Factors

I turn to the public factors.

The "practical considerations that could make the trial easy, expeditious, or inexpensive" do not significantly favor either location. The government contends that its witnesses would be burdened by traveling to New Jersey. From a public interest point of view, however, a Texas forum is not cost-free, either. "This argument . . . fails to take into account that litigation of this case affects public employees' time regardless of location." *Alvarado*, 2017 WL 2303758 at *7. I am furthermore not convinced that efficiencies would result from this case's minor overlap with Ms. Juarez's suit against CoreCivic; the issues in the CoreCivic case primarily concern conditions at the Texas facility, not medical negligence by ICE staff. In any event the effect would be to drag New Jersey witnesses into a Texas litigation against CoreCivic concerning matters irrelevant to their testimony.

Second, I reject the assertion of the United States' assertion that the State of Texas has a strong interest in deciding this controversy. True, the malpractice claims are brought under Texas tort law, but the parties point to no particular danger that a New Jersey court would compromise the public policies of Texas *via* its application of these fairly basic negligence principles. Moreover, this is a case involving the treatment of immigration detainees, and the party defendant is not Texas, but the United States. As the court explained in *Alvarado*, "[i]mmigration, and the treatment of those who have entered the United States without inspection is a matter of national concern." 2017 WL 2303758 at *7. "The alleged mistreatment of plaintiff was by the national

government, giving rise to a national interest in the matters to be litigated." *Flores*, 142 F. Supp. 3d at 291. "Courts have found that public interests do not warrant a transfer of venue where issues are national in scope." *Id.*; (citing *Joao Control & Monitoring Sys., LLC v. Ford Motor Co.*, 2013 WL 4496644 at *3 (D. Del. Aug. 21, 2013)); *see also Doe v. United States*, 2017 WL 4864850 at *3 (M.D. Tenn. Oct. 26, 2017) ("All states have an interest in the country's policies and practices for processing and detaining asylum seekers.").

Third, I am similarly unconvinced that a Texas court's experience in applying Texas state law carries much significance where "the only matters of state law involve common law torts or negligence." *Alvarado*, 2017 WL 2303758 at *7; *Yocham v. Novartis Pharmaceuticals Corp.*, 565 F. Supp. 2d 554, 560 (D.N.J. 2008); *Flores*, 142 F. Supp. 3d at 290 ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex. The court can ascertain Texas law with help from counsel."). This case would not require me to interpret Texas statutes or regulations, or to determine any issues of first impression best left to courts more experienced in Texan legal issues. Courts, state and federal, apply other states' negligence law daily, as a matter of course. I thus conclude this factor is not of particular importance in this case.

Fourth, and last, I do not consider court congestion to be a particularly persuasive basis to transfer this case. It is true, of course, that the District of New Jersey has a virtually unparalleled shortage of judges and a significant caseload.[18] That consideration, however, does not outweigh the other factors discussed above. I am certain, moreover, that the Western District of Texas is a busy court, and that its judges have plenty to do.

In light of the fact that Ms. Juarez elected to bring this case in New Jersey and because litigating in Texas would be a significant hardship for her, I conclude that transfer is not warranted.

---

[18]     *See* N.Y. Times, "Judges Juggle Over 2,700 Cases Each as Families Wait for Day in Court," https://www.nytimes.com/2021/03/17/nyregion/federal-court-nj-judges.html (March 17, 2021) (DNJ per-judge caseload is three times the national average).

**III.    CONCLUSION**

For the reasons set forth above, the motion of the United States for transfer of venue is denied. A separate order will issue.

Dated: March 18, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**