UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **YAZMIN JUÁREZ COYOY, on her own behalf and as surviving parent of MARIEE CAMYL NEWBERRY JUÁREZ**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA**,<br><br>Defendants. | Civil Action No. 2:20-cv-02501 (JXN) (SDA)<br><br>**OPINION**<br><br>**December 26, 2024** |

### **INTRODUCTION**

Plaintiff Yazmin Juarez Coyoy ("Plaintiff") files the instant motion to compel the production of two unredacted documents produced by Defendant United States of America ("Defendant"): (i) a Dilley IV Recommendations Synopsis Word Document dated June 21, 2018, Bates stamp # USA_NJ_0023533 (the "Dilley Chart"); and (ii) a September 26, 2017 CRCL Outbrief email sent by Commander Demetria Sawyers, the Health Services Administrator and primary on-site supervisor at Dilley, Bates stamp # USA_NJ_0023234 (the "CRCL Outbrief Email"). (Pl.'s Br., ECF No. 117). Defendant opposes the motion claiming that the redacted language is protected from disclosure under the deliberative process privilege. (ECF No. 120).

### **FACTUAL BACKGROUND**[1]

Plaintiff and her 21-month-old daughter, Mariee, made the difficult journey from Guatemala to the United States by crossing the Mexican/U.S. border in South Texas. (Compl. ¶ 1, ECF. No. 1). They were detained upon their arrival at the South Texas Family Residential Center

---

[1] The Court gleans the following relevant facts from Plaintiff's Complaint.

in Dilley, Texas ("Dilley"), an immigration detention facility run by U.S. Immigration and Customs Enforcement ("ICE"). (*Id.* ¶¶ 12-13). Sadly, Mariee passed away on May 10, 2018. (*Id.* ¶ 1). Plaintiff alleges Mariee's death was caused by sub-par conditions at Dilley, including living in "disease-ridden" quarters, waiting hours for medical treatment only to be turned away, and being given a cursory medical examination that fell below the required standard of care. (*Id.* ¶ 3).

According to Plaintiff, after their arrival at Dilley, she and Mariee were assigned to a small room with several sick children. (*Id.* ¶ 17). Within a week, Mariee began developing upper respiratory symptoms. (*Id.* ¶ 19). On March 11, 2018, an ICE Health Services Corp. ("IHSC") physician assistant examined Mariee, diagnosed her with an upper respiratory infection and prescribed Tylenol. (*Id.* ¶ 20). Plaintiff again sought medical attention the following day when Mariee's symptoms worsened and included cough, congestion, fever, diarrhea, and vomiting. (*Id.* ¶ 21). Another IHSC physician assistant diagnosed her with an ear infection and acute bronchiolitis, and prescribed her antibiotics, fever reducers, and oral hydration. (*Id.*) Plaintiff requested further examinations, but the physician assistant declined and instructed Plaintiff to return if Mariee's symptoms worsened. (*Id.*).

Mariee's symptoms worsened, and she could not hold down the prescribed antibiotics. (*Id.* ¶ 22). Plaintiff again sought medical attention at the IHSC clinic multiple times but was left waiting for many hours and was turned away twice and told to return the next day. (*Id.* ¶ 22). The clinic waiting area resembled a large gymnasium where sick and healthy individuals were not separated. (*Id.* ¶ 23). When Plaintiff and Mariee managed to see IHSC medical staff, their appointments lasted only minutes and did not address Plaintiff's concerns about Mariee's deteriorating condition. (*Id.*)

On March 21, 2018, Mariee had a high fever, elevated respiratory rate, rapid heart rate, cough, congestion, sneezing, and a runny nose. (*Id.* ¶ 25). The IHSC physician diagnosed her with

acute viral bronchiolitis and prescribed Pedialyte, ibuprofen, Zyrtec, and Vicks VapoRub. (*Id.*). Plaintiff contends this was indicative of the sub-standard care her daughter received because, for example, Vicks is not supposed to be used by children under the age of two because it can cause respiratory distress. (*Id.* ¶ 26).

On March 23, 2018, Plaintiff once again brough Mariee to the clinic because, in addition to her existing symptoms, she began vomiting clear liquid. (*Id.* ¶ 28). The examination revealed she had a borderline oxygen saturation of 96 percent, an elevated heart rate, ongoing temperature and "red sclera" which is indicative of adenovirus. (*Id.*). By this point, Mariee had been sick for almost two weeks and Plaintiff requested the nurse conduct a more detailed examination of her lungs. (*Id.* ¶ 29). The IHSC nurse listened to Mariee's lungs, returned them to the housing area, and said a referral would be made for Mariee to see a provider. (*Id.*) However, Mariee never saw a provider because she and Plaintiff were transferred out of Dilley the following morning. (*Id.* ¶ 30). Although Mariee was never examined by medical personnel prior to her departure, Plaintiff contends that ICE medical records falsely stated that a nurse conducted a transfer summary and medically cleared Mariee for release from Dilley on March 25, 2018. (*Id.* ¶ 31).

Plaintiff and Mariee arrived in New Jersey via plane on March 26, 2018, at which point Mariee's condition was "dire." (*Id.* ¶¶ 35, 36). Plaintiff took Mariee to a pediatrician that day who prescribed additional medication and instructed Plaintiff to go to the emergency room if Mariee's condition worsened. (*Id.*). That evening, Plaintiff rushed Mariee to the emergency room where she was admitted with acute respiratory distress and blood oxygen levels of 85%. (*Id.* ¶ 37). Mariee tested positive for adenovirus and parainfluenza 3. (*Id.*). Mariee was treated for six weeks at two different hospitals requiring several treatments including a ventilator and extracorporeal membrane oxygen ("ECMO") device. (*Id.*). Doctors even considered a lung transplant. (*Id.* ¶ 38).

However, Mariee died on May 10, 2018, following an intrathoracic hemorrhage that resulted in irreversible brain and organ damage. (*Id.* ¶ 39). The medical examiner identified the cause of death as bronchiectasis, pulmonitis, and pneumothorax. (*Id.* ¶ 39).

Plaintiff filed this action on behalf of Mariee under the Federal Tort Claims Act ("FTCA") for negligence, gross negligence, and wrongful death under Texas law. (*Id.*, passim). Plaintiff alleges Defendant breached its duty to Mariee by (1) failing to provide her with adequate medical care, and (2) failing to ensure she was fit to travel. (*Id.* ¶¶ 48, 54, 61, 68). Plaintiff also alleges that the nurse who cleared Mariee for release from Dilley exceeded the scope of her license to approve the clearance. (*Id.* ¶ 76).

Defendant denies that it breached the standard of care and denies that the breach of any duty owed by any government employee resulted in Mariee's death. (Def.'s Answer, Defenses ¶ 15, ECF No. 54). Defendant further contends that Plaintiff denied and refused some medical care for Marie. (*Id.*, Defenses ¶ 23). Defendant also contends that the illness that ultimately resulted in Mariee's death was either pre-existing, or it was developed after Mariee left Dilley. (*Id.*, Defenses ¶ 27).

## RELEVANT PROCEDURAL HISTORY

Plaintiff filed the Complaint on March 6, 2020. (Compl.). After motion practice concerning venue, Defendant filed its Answer on April 16, 2021 and then an Amended Answer on February 14, 2022. (ECF Nos. 31 and 54). An initial scheduling order was entered on June 6, 2022. (ECF No. 64). Discovery has proceeded and several amended scheduling orders have been entered, most recently on October 30, 2024. (ECF Nos. 103, 107, 112, 115). As part of discovery, Defendant produced tens of thousands of pages of hard copy and electronic documents. (Def.'s Opp. at 7, ECF No. 120).

4

With leave of Court, Plaintiff filed the instant motion on November 8, 2024. (Pl.'s Br). Defendant filed its Opposition on November 8, 2024. (Def.'s Opp.). Plaintiff was granted leave to file a Reply. (Pl.'s Reply, ECF No. 121). Initially, Plaintiff's motion concerned five documents redacted by Defendant. (Pl.'s Br.). However, Defendant subsequently agreed to produce two of those documents and Plaintiff withdrew its request for one of the documents after reviewing Defendant's Opposition. (Pl.'s Reply at 1, n.1). Thus, at present, there are only two documents at issue in this motion: (i) the Dilley Chart; and (ii) the CRCL Outbrief Email.

## THE TWO DOCUMENTS AT ISSUE

This motion concerns whether Defendant properly redacted certain information from the Dilley Chart and the CRCL Outbrief Email on the basis of the deliberative process privilege. Pursuant to this Court's order dated October 28, 2024 (ECF No. 115), the Government submitted the redacted and unredacted versions of these documents for this Court's *in camera* review.

Neither of these documents concern actual care provided to Mariee. Rather, they pertain to Defendant's response to a site visit conducted by the main policy advisor of the Department of Homeland Security ("DHS"), the DHS office for Civil Rights and Civil Liberties ("CRCL") in September 2017. (Def.'s Opp. at 2).

ICE promulgated the Family Residential Standards, which govern various aspects of facility policies and management at its Family Residential Centers, including Dilley. (*Id.* at 5). The Family Residential Standards set policies with respect to security, education, visitation, grievances, and – pertinent to the instant matter – healthcare. (*Id.*). The first edition was published in 2007. (*Id.*).

In 2014, the United States experienced a humanitarian crisis as tens of thousands of unaccompanied children and family groups entered the country through the Mexico/United States

border. (*Id.*). DHS led the crisis response. (*Id.*). DHS's main policy advisor was CRCL. (*Id.*). As the Family Residential Centers came under intense scrutiny, CRCL provided support and expertise in planning, revising standards and oversight of the centers, including Dilley. (*Id.* at 6). As part of that process, CRCL conducted multiple onsite inspections of Family Residential Centers, bringing in experts in various fields. (*Id.*). CRCL then issued reports with recommended changes or enhancements to facility policies and procedures, as well as the Family Residential Standards. (*Id.*). Following receipt of CRCL's report, ICE engaged in internal discussions to determine its response, including what recommendations to adopt or reject. (*Id.* at 6; Decl. of Russell Hott ("Hott Decl."), ¶ 14, ECF No. 120-1). At the conclusion of this iterative process, ICE issued a final agency response CRCL's recommendations. (Def.'s Opp. at 6; Hott Decl. ¶ 14). Ultimately, DHS promulgated a second edition of the Family Residential Standards in 2020. (Def.'s Opp. at 5; Hott Decl. ¶ 10).

It is this decisional process that is the subject of the instant motion. Namely, CRCL conducted a site inspection of Dilley in September 2017, one of four it conducted at that facility. (Def.'s Opp. at 7). Following the inspection, CRCL made recommendations to ICE. (*Id.*).

The Dilley Chart is a table that was created following CRCL's September 2017 site visit that contains four columns: (i) CRCL Recommendations; (ii) Expert Findings/Issues; (iii) ICE Response; and (iv) Draft Responses Dilley III. Defendant redacted the third and fourth columns of the chart on the basis of the deliberative process privilege. Defendant produced the final agency decision.[2]

---

[2] At the time of the briefing of the motion and oral argument, Defendant had been unable to locate the final agency response to the September 2017 CRCL inspection of Dilley. Instead, it had only produced drafts of the final response. On December 20, 2024, while this decision was pending, Defendant notified the Court that it had located the final response and produced it to Plaintiff without any redactions. (ECF No. 124).

6

The Court conducted an *in camera* review of the third and fourth columns of the Dilley Chart redacted from production. Without providing specifics, these columns contain a back-and-forth between stakeholders at Dilley and ICE as to whether to concur with or reject a recommendation, what policies were already in place to address the identified issue, what policies needed to be reviewed for compliance and what policies and standards needed to be revised or updated. The document discusses recommended changes and updates to the Family Residential Standards, the resident handbook and other facility policies and procedures. It contains redlined language and comment bubbles. Notably, much of the document does not even address healthcare issues, and instead relates to issues wholly irrelevant to this case – such as interpretation services and hot water heaters.

The CRCL Outbrief email is a September 26, 2017 email from Commander Sawyers. It is a response to a September 22, 2017 email from Michael Sheridan that sets forth a summary from the outbrief for CRCL's inspection/audit and identifies several categories of observations and recommendations. Defendant redacted Sawyers' responses, which she describes in her introductory paragraph as "the current administration's thought process, plan and goals for FY18." She further explains that this is her "internal response" to the recommendations concerning medical care. This document is clearly not the agency's final response, and is part of the process whereby the agency determined how it was going to respond to CRCL's various recommendations.

# **LEGAL ARGUMENT**

**I.      The Deliberative Process Privilege Generally**

"The deliberative process privilege permits the government to withhold documents containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *Redland Soccer Club v. Dep't of the Army*, 55 F.3d 827, 853 (3d. Cir. 1995) (citations omitted). It protects "the decision making processes of government agencies" and, in particular, "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotations and citations omitted). The ultimate purpose of this privilege is to "prevent injury to the quality of agency decisions which could result from premature and indiscriminate disclosure" of internal deliberations that result in policy change. *D.A. v. Nielsen*, No. 18-9214, 2018 WL 3158819, at *3 (D.N.J. June 28, 2018) (quoting *Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 751 (E.D. Pa. 1983)). "The privilege recognizes 'that were agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.'" *Del. Riverkeeper Network v. Del. River Basin Comm'n*, 300 F.R.D. 207, 210 (D.N.J. 2014) (quoting *First E. Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C. Cir. 1994) (internal quotations and ellipses omitted)). [3]

---

[3] "Courts in the Third Circuit have frequently cited and relied upon the case law of the U.S. Court of Appeals for the D.C. Circuit when the government invoked the deliberative process privilege." *Del. Riverkeeper Network,* 300 F.R.D. at 213-14; *see also Griffin-El v. Beard*, No. 06-2719, 2009 WL 1606891, at * 6, n. 3 (E.D. Pa. June 8, 2009) ("The Court notes that we accord case law from the U.S. Court of Appeals for the District of Columbia Circuit quite a bit of persuasive force due to the frequency with which courts in the Third Circuit have cited and relied upon it where the government seeks to withhold documents pursuant to the deliberative process privilege.") (collecting cases).

For the privilege to apply, the documents must be both predecisional and deliberative. *Del. Riverkeeper Network*, 300 F.R.D. at 211 (citing *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 183 (3d Cir. 2007)). The privilege "distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) (citation omitted). To be pre-decisional, "a document must concern an anticipated agency decision and have been generated prior to the actual decision being reached; it cannot involve a communication concerning the decision made after the decision has already been adopted." *United States v. Pechiney Plastics Packaging, Inc.*, No. 09-5692, 2013 WL 1163514, at *35 (D.N.J. Mar. 19, 2013) (citing *NLRB*, 421 U.S. at 151-52). To be deliberative, a document must reflect "the give and take of the consultative process." *Del. Riverkeeper Network*, 300 F.R.D. at 211 (quoting *New Jersey v. RPI Energy Mid-Atlantic Power Holdings, LLC*, No. 07-5298, 2013 WL 272763, at *1 (E.D. Pa. Jan. 24, 2013)).

The privilege also "does not protect factual information, even if such information is contained in an otherwise protectable document, as long as the information is severable." *Redland*, 55 F.3d at 854. "However, 'factual information that reveals the deliberative process and cannot be severed from the deliberative context is protected.'" *Pechiney Plastics,* 2013 WL 1163514, at *13 (citing *In re United States*, 321 Fed. Appx. 953, 959 (Fed. Cir. 2009) (further citations omitted)).

Assertion of the deliberative process privilege requires a two-step review by the district court: (1) the court must first decide whether the communications are, in fact, privileged; and (2) the court must then balance the interests of the parties. *Redland,* 55 F.3d at 854. The court may perform a preliminary *in camera* review of the documents in question before balancing the interests and exercising its discretion. *Id.* at 855; *see also Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*,

9

426 U.S. 394, 406 (1976) ("[I]n camera review is a highly appropriate and useful means of dealing with claims of governmental privilege."). Here, the Court has conducted an *in camera* review of the two unredacted documents at issue.

Even if the privilege is applicable, it is not absolute. *Redland*, 55 F.3d at 854 (citing *First E. Corp.*, 21 F.3d at 468, n.5; *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993)). If the government has satisfactorily demonstrated that the privilege applies, the party seeking disclosure may overcome the privilege in one of two ways: (i) "by showing a sufficient need for the material in the context of the facts or nature of the case;" or (ii) "by making a *prima facie* showing of misconduct." *Redland*, 55 F.3d at 854 (quoting *In re Grand Jury*, 821 F.2d 946, 959 (3d. Cir. 1987) (internal citations omitted)). In balancing the parties' interests, the Third Circuit has directed the court to consider the following factors:

    (i)    the relevance of the evidence sought to be protected;
    (ii)   the availability of other evidence;
    (iii)  the 'seriousness' of the litigation and the issues involved;
    (iv)  the role of the government in the litigation; [and]
    (v)   the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* (quoting *First E. Corp.*, 21 F.3d at 465, n.5). The burden is on the party seeking the discovery. *Id.*

Against this backdrop, the Court determines whether the deliberative process privilege applies to the information redacted from the Dilley Chart and the CRCL Outbrief email and, if so, whether Plaintiff has overcome that privilege. For the reasons set forth below, the Court finds that the privilege applies and that Plaintiff has not met her burden of overcoming that privilege.

## II.     Application of the Deliberative Process Privilege

Of the tens of thousands of pages of discovery produced by Defendant, the deliberative process was asserted only with respect to a portion of two documents: the Dilley Chart and the CRCL Outbrief email. Plaintiff contends that the privilege does not apply because the redacted information is neither predecisional nor deliberative. Plaintiff advances two arguments in support of this contention: (i) that the documents are not connected to law or policy making; and (ii) the documents reflect routine operating decisions. (Pl.'s Br. at 4)

Plaintiff first argues that the redacted information is not sufficiently connected to law or policy making so as to fall within the ambit of the privilege. Plaintiff speculates that the documents contain the opinions, impressions, disagreements, or views of low-ranking ICE personnel that are distant from those in the hierarchy making policy decisions. (Pl.'s Br. at 12). She argues that there is no nexus between the documents and ICE policy making and, therefore, the privilege does not apply. Relying on two out of district cases, Plaintiff contends that documents concerning an "agency's interpretations or 'application of a policy to guide further decision-making' are not deliberative." (Pl.'s Reply at 5) (citing *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010); *Sack v. Dep't of Just.*, 65 F. Supp. 3d 29, 38 (D.D.C. 2014). Plaintiff posits that the information contained in the Dilley Chart and CRCL Outbrief email did not result in policy change but, rather, was an assessment by non-decision-makers of how existing standards were being applied at Dilly. (Pl.'s Reply at 6-7). It is Plaintiff's belief that the documents merely referenced operational issues and recommended enhancements to facility procedures, and did not relate to important questions of law or policymaking. (Pl.'s Br. at 12; Pl.'s Reply at 7-8).

Plaintiff's arguments in this regard are not persuasive. The redacted communications were not simply an assessment of compliance with existing standards; they resulted in a formal agency

11

response and policy change by ICE. *Contra D.A.*, 2018 WL 3158819, at *1-2 (worksheets indicating whether an asylum applicant should be granted parole pursuant to pre-existing factors set by ICE was not protected by the deliberative process privilege). Notably, the CRCL report, including the accompanying expert opinions, was produced in its entirety. *Contra Harvard Immigr. & Refugee Clinical Program v. U.S. Dep't of Homeland Sec.*, No. 21-12030, 2023 WL 4685961, at *10-11 (D. Mass. July 21, 2023) (holding that the government's use of the deliberative process privilege to withhold expert reports prepared by CRCL-retained experts who investigated ICE's use of solitary confinement at detention centers was improper because they contained observations of first impression and expert analyses of facts and information gathered during the course of an investigation, rather than deliberations and recommendations about future decisions). The final agency response to the CRCL report was also produced in its entirety. The only thing withheld was the internal deliberations between agency stakeholders concerning the facility's response to the CRCL report.

As explained by Russell Hott, Acting Executive Associate Director for Enforcement and Removal Operations ("ERO") with ICE, following the receipt of CRCL's recommendations, Defendant engaged in an iterative process wherein contributors from various components of the agency (including IHSC, ERO, Juvenile and Family Residential Management Unit ("JFRMU")), and federal contractors provided input as to whether they concurred or disagreed with CRCL's recommendations, how the recommendations should be refined, and ICE's ultimate response to the CRCL report. (Hott Decl. ¶¶ 14, 17). As Hott explains, "[t]hese internal deliberations were performed at the behest of ICE senior officials and were transmitted back to those senior officials for evaluation and possible placement into a formal written response to CRCL indicating concurrence or nonconcurrence with CRCL recommendations." (*Id.* ¶ 18). The deliberations were

predecisional in nature because they reflected a collaborative discussion and evaluation by senior officials of what recommendations to accept or reject, and ultimately resulted in a final agency decision. (*Id.*). Thus, these internal deliberations were directly connected to policy making and policy changes by ICE at Dilley and other Family Residential Centers. Indeed, they eventually led to a full revision of the Family Residential Standards in 2020.

Plaintiff secondarily argues that the redacted information merely pertains to a routine compliance process and, therefore, is not covered by the deliberative process privilege. (Pl.'s Br. at 13-14). Plaintiff suggests that the CRCL site visits were a regular, annual occurrence as part of ICE's regular process of self-evaluation. (*Id.*). Improperly relying on *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70 (2d. Cir. 2002), Plaintiff argues that "such a 'routine and ongoing process of agency self-evaluation' does not qualify for deliberative process protection." (Pl.'s Br. at 14).

Plaintiff's arguments are, again, unavailing. These were not routine inspections to assess compliance with existing standards. CRCL was engaged by DHS and ICE in direct response to a humanitarian crisis that brought intense scrutiny on ICE's Family Residential Centers. (Def.'s Opp. at 3-5; ECF Nos. 120-2, 120-3). CRCL's role was to provide advice on policy and practice to DHS at the direction of former President Obama so that necessary changes could be implemented. (Def.'s Opp. at 3-5; ECF Nos. 120-2, 120-3). This is similar to an agency memorandum that was protected from disclosure by the Second Circuit in *Tigue*, 312 F.3d at 73-74 (finding that the deliberative process privilege applied to a memorandum prepared for a task force charged with gathering information and assisting the agency in developing and reforming policy). Indeed, a subsequent Second Circuit decision made it clear that an "agency's critical review [of its policies] represents a specific decision-making process and the agency may withhold records reflecting

13

deliberations relevant to that process." *Nat. Res. Def. Council v. EPA*, 19 F.4th 177, 192 (2d Cir. 2021).

Accordingly, the Court finds that the information redacted from both the Dilley Chart and the CRCL Outbrief email is both predecisional and deliberative, and therefore covered by the privilege. They reflect the back-and-forth between stakeholders at Dilley and ICE so senior officials could determine whether to concur or reject CRCL's recommendations. These discussions were held before ICE issued its final agency response and before it published the updated Family Residential Standards, making them predecisional. The deliberations were conducted at the direction of ICE senior officials, so they could be evaluated and potentially used in ICE's formal agency response. The inspections were not routine compliance assessments; rather, they were conducted for the purpose of bringing about agency change. The redacted communications therefore fall squarely within the scope of deliberative process privilege.

### III. Balancing Of Interests

Having established that the privilege applies, the court must next determine whether Plaintiff has overcome the privilege by establishing either (i) misconduct; or (ii) sufficient need considering the factual context and nature of this case. *Redland*, 55 F.3d at 854. The Court concludes that Plaintiff has failed to meet this burden.

#### A. Plaintiff Has Failed to Establish Misconduct

Plaintiff argues that, even if the privilege applies, it is overcome here because this case concerns government misconduct. Specifically, Plaintiff claims that the redacted language is likely to reveal candid assessments of medical care at Dilley, details on Dilley's compliance or lack thereof with federal policies and standards, and discussions about how to achieve compliance at Dilley. (Pl.'s Br., ECF No. 117-1, at 4). In making this argument, Plaintiff properly recognizes that

14

"when the information sought may shed light on alleged government malfeasance, the privilege is denied," *Burbar v. Inc. Village of Garden City*, 303 F.R.D. 9, 14 (E.D.N.Y 2014); but then improperly applies this exception to the facts in the instant case.

For the misconduct exception to apply "[i]mproper motivation on the part of a government agency" must be a central issue in the case. *Del. Riverkeeper Network*, 300 F.R.D. at 214 (declining to bypass the deliberative process privilege where the lawsuit did not challenge the agency's subjective intent in approving the plaintiff's application but, rather, whether that approval was contrary to applicable procedural and requirements the agency was required to follow); *see also Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 135-36 (D.D.C. 2005) (declining to apply the deliberative process privilege in a case alleging malicious prosecution and abuse of process); *Ciaramella v. Zucker*, No. 18-6945, 2021 WL 4219501, at *4 (S.D.N.Y. Sept. 16, 2021) (rejecting the deliberative process privilege in a case challenging coverage decisions made by the Commissioner of Health where the basis for declining coverage was central to the claims).

Indeed, unlike the present matter, the cases cited by Plaintiff in support of applying the misconduct exception involved causes of action that hinged upon the government's *intent*. *See, e.g.*, *Scott v. Bd. of Educ. of City of E. Orange*, 219 F.R.D. 333, 337-38 (D.N.J. 2004) (holding that the deliberative process privilege was overcome in a § 1983 action challenging the board's decision to fire plaintiff because "inquiry into the Board's pre-decisional mental impressions and discussions [wa]s necessary to challenge the purported reason for Plaintiff's termination"); *Burbar*, 303 F.R.D. 9 (E.D.N.Y. 2014) (finding that in a lawsuit alleging malicious prosecution and abuse of process, intent and decision-making process of government officials was central to the case and therefore the deliberative process privilege did not apply to the district attorney's file for the plaintiff's criminal case); *Montrevil v. Decker*, No. 20-264, 2021 WL 11690690, at *5 (E.D.N.Y.

15

July 19, 2021) (holding the deliberative process privilege did not apply to emails between ICE officials regarding plaintiff's removal proceedings, where the plaintiff alleged he was deported in retaliation for engaging in protected First Amendment activity, and ICE's "motivation to remove [the plaintiff] . . . [wa]s the crux of [his] claim.")

Here, Plaintiff's case alleges negligence, gross negligence and wrongful death under Texas law. (ECF No. 1). There is no assertion that the government intentionally sought to harm Mariee. Plaintiff fails to cite a case, from this jurisdiction or beyond, that applies the government malfeasance exception in a negligence case. To the contrary, at least one Federal court has found that "allegations of negligence by governmental actors does not necessitate overcoming the deliberative process privilege based on governmental misconduct." *Rothschild v. United States*, No. 15-030, 2016 WL 8856652, at *4 (D. Wyo. Mar. 16, 2016).

Under Texas law, negligence requires Plaintiff to establish: "(1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *City of Austin v. Membreno Lopez as Next Friend of Lopez*, 632 S.W.3d 200, 210 (Tex. App. 2021) (citations omitted). Even gross negligence does not require proof of a nefarious motive; it only requires proof of "objectively higher risk than ordinary negligence" and "conscious indifference" to the safety of others. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008) (citations omitted). None of Plaintiff's causes of action requires proof of intentional malfeasance by the government, nor is any such intent alleged in the Complaint.

In sum, the government misconduct exception does not apply in the instant case. Plaintiff's claims do not hinge upon the government's intent, and information regarding the deliberative process employed by Defendant in determining whether or not to concur with or reject CRCL's

16

recommendations will not shed light on whether Defendant is liable for negligence, gross negligence or wrongful death.

### B. Plaintiff Has Not Established a Sufficient Need For The Redacted Information That Overcomes the Privilege

Having determined that the redacted information is privileged, and that they do not relate to government misconduct, the Court must determine whether Plaintiff's need for the documents outweighs Defendant's interest in maintaining the privilege considering the facts and nature of this case. In reaching this determination, the Court analyzes each of the five factors adopted in *Redland* and concludes that the privilege is not overcome.

#### 1. Relevance of the Evidence Sought to be Protected.

As an initial matter, much of the information contained in the Dilly Chart is irrelevant to Plaintiff's case, as it pertains to issues unrelated to medical care at the facility. Focusing on those portions of the Dilly Chart that pertain to medical care, as well as Commander Sawyer's responses to the CRCL audit summary in the CRCL Outbrief email, the redacted information is not relevant or probative of Plaintiff's claims. Plaintiff was provided those columns of the Dilley chart that identify CRCL's recommendations and the experts' opinions. That information alone reveals potential concerns about, among other things, medical care and conditions at Dilley. Plaintiff also now has the final agency response, so she knows whether senior officials at Dilley ultimately concurred or disagreed with CRCL's recommendations. This is all Plaintiff needs to assess Dilley's compliance or lack of compliance with existing standards of care so as to potentially establish negligence, gross negligence or wrongful death. The deliberations leading up to the final agency decision are not relevant to whether the government is liable under any of these theories.

#### 2. Availability of Other Evidence

This factor weighs in favor of upholding the privilege, particularly in light of the fact that Defendant has now located the final agency response. Plaintiff has the report containing CRCL's recommendations, the final agency response, the 2007 Family Residential Standards and the 2020 Family Residential Standards. Defendant also produced all expert reports from CRCL's 2017 site visit, without redactions. In addition, Defendant provided Plaintiff with thousands of emails and hundreds of documents about medical care at Dilley. Plaintiff has already taken numerous depositions and has the additional ability to take the depositions of key contributors, including Commander Sawyer and an IHSC representative. Under these circumstances, the Court finds that there is other information available such that the deliberative process privilege is not overcome with respect to the two documents at issue. *See Pechiney Plastics*, 2013 WL 1163514, at *26 ("[T]he relevance of the documents being withheld is offset by the fact much of the information contained in the documents has already been produced to [the party seeking production] in other sources."); *Martinez v. Fuentes*, No. 15-2932, 2017 WL 2345703, at *7 (D.N.J. May 30, 2017) (holding that documents subject to the deliberative process privilege did not need to be disclosed because the government defendant already provided other documents with the same information, and plaintiff was still able to depose witnesses regarding the subject matter).

### 3. The litigation and the issues involved are serious.

There is no question that this is serious litigation, nor do the parties dispute this factor. This lawsuit concerns the death of an infant and who bears responsibility for her death. However, Defendant argues that the seriousness of this lawsuit will not turn on the internal, preliminary deliberations in the redacted documents. This Court agrees for the reasons set forth above.

### 4. The Government's Role in the Litigation

The government's role in this litigation is central. It is the only defendant. However, this factor, alone, is not sufficient to overcome the privilege. The government has been a party in cases

where the deliberative process was nonetheless upheld. *See Pechiney Plastics*, 2013 WL 1163514, at *26 (finding this factor alone did not weigh in favor of disclosure because "while the United States is seeking affirmative judicial relief" in this matter, that fact, coupled with the fact that the withheld documents were relevant, "is offset by the fact that much of the information contained in the documents has already been produced to [the defendant] in other sources.").

### 5. The Possibility of Future Timidity by ICE employees if these documents are disclosed.

Defendant contends that this is the most important factor in the balancing test. Mr. Hott, in his declaration, contends that "the cooperative relationship between CRCL and ICE . . . depends on candid discourse about policies and practices that affect noncitizens' civil rights and civil liberties." (Hott Decl. ¶ 22). He explains that "ICE recognizes and expects the process to be largely privileged and confidential in order to encourage transparency." (*Id.* ¶ 15). The ongoing inspections by CRCL, driven by the humanitarian crisis that began in 2014, have resulted in positive change at Family Residential Centers nationwide. (Def.'s Opp. at 6 (citing 2015 Annual Rpt. at 8, ECF No. 120-3)). Hott explains that the success of these programs is contingent upon IHSC employees offering uninhibited opinions, advice and recommendations. (Hott. Decl. ¶ 24). He expresses concern about the chilling effect disclosure of these deliberations will have on the decision making process and the overall success of the program. (*Id.* ¶ 25).

In response, Plaintiff contends the possibility of future timidity can be alleviated by requiring the documents to be disclosed pursuant to a confidentiality order. The Court is not satisfied that this alone would be sufficient to protect the free-flowing exchange of ideas that leads to critical improvements at these facilities. Even with a confidentiality order in place, if key decision makers know their deliberative process might be discoverable in future litigation against

19

their employer, they may very well affect their candor. Accordingly, the Court finds that this factor weigh's strongly in favor of upholding the privilege.

## IV. Conclusion

In conclusion, the Court finds that the redacted information in both the Dilley Chart and the CRCL Outbrief email are covered by the deliberative process privilege. They are predecisional and deliberative in nature. They concern changes to policies and standards implemented as a result of a humanitarian crisis stemming from a sharp incline in noncitizens crossing the Mexico/United States border and scrutiny of the Family Residential Centers where these individuals were detained upon their arrival to the United States. There is no allegation of governmental misconduct such that the privilege is inapplicable. Nor does a balancing of the factors weigh in favor of overcoming the privilege. Accordingly, the documents were properly redacted by Defendant on the basis of the deliberative process privilege, and Plaintiff's motion to compel is DENIED.

So Ordered.

*/s/ Stacey D. Adams*
Hon. Stacey D. Adams, U.S.M.J.